**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Local Counsel for Plaintiff*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FERNICOLA, Derivatively on Behalf of THE TRADE DESK, INC.<br><br>Plaintiff,<br><br>v.<br><br>JEFF T. GREEN, LAURA SCHENKEIN, LISA J. BUYER, ANDREA L. CUNNINGHAM, KATHRYN E. FALBERG, GOKUL RAJARAM, DAVID B. WELLS, and SAMANTHA JACOBSON,<br><br>Defendants,<br><br>and,<br><br>THE TRADE DESK, INC.<br><br>Nominal Defendant. | Case No: 26-cv-06490<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Fernicola ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of The Trade Desk, Inc. ("Trade Desk," "TTD," or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein under Section 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts

- 1 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant Trade Desk*** is a Nevada corporation with its principal executive offices located at 42 N. Chestnut Street, Ventura, California 93001. Trade Desk's common stock is traded on the NASDAQ under the ticker symbol "TTD."

### Director Defendants

8. ***Defendant Jeff T. Green*** ("Green") is a co-founder of the Company and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

has served as the Company's President and Chief Executive Officer ("CEO"), and as Chairman of the Board since November 2009. In addition, Defendant Green is the controlling shareholder of the Company. For the 2024 Fiscal Year, Defendant Green received $6,756,299 in total compensation from the Company.

9. **Defendant Lisa J. Buyer** ("Buyer") has served as a director of the Company since March 2019 and as Lead Independent Director of the Company since February 2021. Defendant Buyer also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee. For the 2024 Fiscal Year, Defendant Buyer received $427,223 in total compensation from the Company.

10. **Defendant Andrea L. Cunningham** ("Cunningham") has served as a director of the Company since January 2022. Defendant Cunningham also serves as a member of the Company's Nominating and Corporate Governance Committee. For the 2024 Fiscal Year, Defendant Cunningham received $355,901 in total compensation from the Company.

11. **Defendant Kathryn E. Falberg** ("Falberg") has served as a director of the Company since August 2016. Falberg also serves as Chair of the Company's Compensation Committee and the Audit Committee. For the 2024 Fiscal Year, Defendant Falberg received $400,009 in total compensation from the Company.

12. **Defendant Gokul Rajaram** ("Rajaram") has served as a director of the Company since May 2018. Rajaram also serves as a member of the Company's Audit Committee and Compensation Committee. For the 2024 Fiscal Year, Defendant Rajaram received $372,509 in total compensation from the Company.

13. **Defendant David B. Wells** ("Wells") served as a director of the Company from December 2015 to May 2025. For the 2024 Fiscal Year, Defendant Wells received $410,009 in total compensation from the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

15. *Defendant Laura Schenkein* ("Schenkein") served as Chief Financial Officer ("CFO") of the Company from June 2023 to August 2025. For the 2024 Fiscal Year, Defendant Schenkein received $11,663,800 in total compensation from the Company.

16. *Defendant Samantha Jacobson* ("Jacobson") has served as Chief Strategy Officer ("CSO") of the Company since February 2022, and as a director of the Company since January 2024. For the 2024 Fiscal Year, Defendant Jacobson received $11,662,963 in total compensation from the Company.

17. Defendants Schenkein and Jacobson together with Defendant Green, *supra*, are collectively referred to herein as the "Officer Defendants."

18. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

### SUBSTANTIVE ALLEGATIONS

**Background**

19. TTD was founded in 2009 by Defendant Green and Dave Pickles, the Chief Technology Officer at the time. It is an advertising technology company that purports to help advertisers optimize their advertising budgets across digital formats, including connected television ("CTV"),[1] webpages, social media, podcasts, mobile devices, computers, and streaming devices.

20. An advertiser's goal is to obtain the highest quality views (known as "impressions") by their target audience—*i.e.*, views that are most likely to result in a

---

[1] Connected television refers to television that is connected to the internet, which allows the television to communicate with advertisers to place ads dynamically.

- 4 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

purchase, a subscription, or whatever action the advertiser wants the customer to take— at the lowest price possible.

21. TTD tracks and collects vast amounts of information about audiences and ad publishers. TTD claims to use proprietary technology and algorithms to analyze that data and then optimally bid on its clients' behalf to place ads in digital spaces (like banners on the top of a website or pop-ups on a mobile device) that will yield the highest quality ad impressions. This type of ad-buying is known as "programmatic advertising."

22. TTD does this through its platform, which is the tool by which advertisers design and execute their ad campaigns. The platform consists of (i) a "front end," the User Experience ("UX") or User Interface ("UI"), through which users interact with the platform; and (ii) a "back end," the under-the-hood engineering that matches a client's ads with available ad space based on underlying data and the client's chosen settings or parameters.

23. TTD's business is ad-buying. According to the Company, its revenue generation is completely dependent on clients not just signing up to use TTD's platform, but actually finding it useful and spending money on it, instead of on competitor platforms. Specifically, TTD only generates revenue by charging its clients a platform fee based on a percentage of a client's total spend on advertising and from providing data and other value-added services and platform features to clients.3 Accordingly, TTD's success rises and falls on the quality, adoption, and engagement with its platform.

**The Importance of Trade Desk's Transition to Kokai**

24. In 2021, TTD launched its latest ad-buying platform, Solimar. Solimar was well-received by TTD's clients because it offered a simple, streamlined user experience and interface. Solimar has a straightforward hierarchy of tasks and settings

- 5 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and allows clients to make bulk changes to campaigns directly in the UI. Multiple former employees—including FE2,[2] FE3, FE4—and, according to the plaintiff in the Securities Class Action (defined below), TTD's clients confirmed that TTD's clients found Solimar useful, productive and easy to operate.

25.    Despite Solimar's adoption and success, on June 6, 2023, Defendant Green abruptly launched Kokai, a new iteration of TTD's platform, to replace Solimar. During his remarks announcing Kokai, Defendant Green promised clients and investors that "nearly all" clients would see an upgrade by "the end of the summer."

26.    From that day forward, the Individual Defendants repeatedly told investors that TTD's switch from Solimar to Kokai was a two-fold, key driver of growth at TTD: first, existing TTD clients purportedly quickly transitioned from Solimar and adopted Kokai due to Kokai's new user interface and improved performance and, as a result, were increasing their spending on the platform; second, Kokai supposedly drew new clients to TTD, diverting spending from competitors to TTD and increasing the Company's market share. For example, on May 8, 2024, Defendant Green stated on an earnings call that "our revenue growth acceleration in the first quarter speaks to the innovation and value that we're delivering to our clients with Kokai," and Defendant Schenkein said Kokai was "help[ing] deliver another quarter of consistently strong growth and profitability to start 2024."

27.    Investors and financial analysts believed and embraced the claims that Kokai drove TTD's financial success. For example, on September 18, 2024, analysts at Insider Monkey explained that Kokai's reported "early results have been encouraging" and that its supposed "[p]erformance metrics across the company have

---

[2]    All references to Former Employees ("FE") and statements attributable to them are taken from the Securities Class Action and are based upon information and belief.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

also improved . . . helping it unlock performance budgets for several years."

**Kokai Adoption Lagged and Failed to Drive Revenue**

28.    At all relevant times, the Individual Defendants repeatedly told investors that its clients were rapidly adopting Kokai—the necessary predicate to TTD's revenue growth.

29.    For example, on November 15, 2023, Defendant Schenkein spoke at the RBC Capital Markets Investor Conference, during which she assured investors that Kokai would "achieve full adoption" by the end of 2024. Similarly, on February 15, 2024, when TTD issued its fourth quarter 2023 results, Defendant Green claimed that Kokai was being "enthusiastically adopted."

30.    Analysts and the market took note of these positive representations regarding client adoption and spend, as well as their impact on TTD's revenue. On February 16, 2024, securities analysts at Davidson reported that "ramping customer adoption of the Kokai new UX/platform" contributed to TTD's "resilience"; and BMO Capital Markets reported that Kokai was the revenue driver that made TTD "particularly attractive." On February 22, 2024, Needham also described Kokai as a "key upside revenue driver[]" for TTD.

31.    While 2024 came and went without "full adoption," the Individual Defendants continued to tout Kokai's purportedly strong adoption rates. For example, on August 8, 2024, during TTD's second quarter 2024 earnings call, Defendant Green stated that he was "incredibly encouraged by the early results from Kokai," stating unequivocally that the Company had "met the moment with Kokai," which was "firing on all cylinders . . . ."

32.    Securities analysts and the market embraced the positive representations regarding client adoption and spend. For example, on August 8, 2024, BTIG reported that TTD's stated adoption rates for Kokai left them "feeling better about the setup

- 7 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for Trade Desk into 2H24 and 2025," and Capital Market Labs similarly reported that "[c]onfidence in future growth is driven by . . . the major Kokai platform upgrade." The next day, a flurry of analyst reports echoed the same enthusiasm based on the assurances: Wedbush highlighted "rising adoption of Kokai, . . . [for which] early results have been overwhelmingly positive"; Morgan Stanley reported that "[t]he higher ROAS [Returns on Ad Spend] that TTD is able to deliver with Kokai is substantial as advertisers aim to optimize ad spend and prove the efficacy of each marketing dollar and over time Kokai may help unlock performance budgets on TTD" and, "if these trends persist, it should help TTD continue to drive strong growth going forward . . . ."

33. During analyst call backs in November 2024, the Individual Defendants again made multiple positive and specific representations regarding the state and pace of Kokai's adoption, with the Individual Defendants stating that nearly 50% of clients had already adopted Kokai and that 100% would adopt by the end of 2025; those representations were in turn reported to the market. Specifically, the Individual Defendants stated the following:

- "~50% of all TTD customers have now adopted Kokai, which has driven a 30% uptick in data usage alongside a 25-30% downtick in CPC/CPA" (told to by the Individual Defendants and reported by BTIG on November 7, 2024);

- Kokai was "to be fully adopted by end of 2025 (currently nearing 50%)" (told to by the Individual Defendants and reported by Guggenheim on November 7, 2024);

- TTD "remain[ed] confident that [Kokai] will achieve a 100% rollout for all advertisers by the end of 2025, while inching towards 50% adoption currently" (told to by the Individual Defendants and reported by Truist on November 7, 2024);

- "ad campaigns run on Kokai were at about 50% penetration of clients during 3Q24" (told to by the Individual Defendants and reported by Needham on November 8, 2024);

- "[c]lients continue to adopt Kokai, and the percentage of spend through Kokai is approaching 50% and is on pace to reach 90% by the end of

- 8 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

next year" (told to by the Individual Defendants and reported by Wedbush on November 8, 2024); and

- "[TTD] Mgmt. remains confident that [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025 (that is, 100% of advertisers' spend via Kokai), while inching towards 50% adoption currently" (told to by the Individual Defendants and reported by Truist on November 20, 2024).

34.     Despite their drumbeat of positive statements about adoption, the Individual Defendants knew (but omitted) that Kokai adoption was significantly slower than represented and that large numbers of clients detested Kokai, rejecting it entirely or at least refusing to increase spend and, as a result, that Kokai was not driving revenue like the Individual Defendants claimed.

**The Representations Regarding Adoption Were False**

35.     First, TTD failed to even get close to achieving "full adoption" by the end of 2024, as the Individual Defendants had claimed would happen. Rather, as the Individual Defendants would later admit, by the end of 2024, at best, only 50% of their clients had adopted Kokai.

36.     Second, TTD's representations regarding 100% adoption by the end of 2025 were, as FE5 put it, detached from reality. As of August 2024, when Defendant Green was telling investors that he was "incredibly encouraged by the early results from Kokai" and Kokai was "firing on all cylinders," only 5–10% of FE5's portfolio's clients had adopted Kokai—including only two of the Company's 10 most critical clients. Similarly, only approximately 18% of FE6's client business had moved to Kokai as of that month. As discussed further below, these slow adoption rates were well known and internally discussed and reported on consistently.

37.     The adoption of Kokai was so poor that Trade Desk specifically enlisted FE7, a Manager of Brand Strategy, in July 2024 to assess why Trade Desk clients and agencies were not adopting Kokai and what they did not like about Kokai. FE7's research was supervised by FE7's boss, David Godycki, and was approved by and

- 9 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

presented to Trade Desk's CMO Ian Colley on December 21, 2024. FE7 recounted that the research project began in July 2024, and the preparation work was finished in September 2024. Consistent with the preparation work, in October 2024, FE7 interviewed 20 different Vice Presidents and Directors of both advertising agencies and TTD clients. As detailed in a final report presented internally at TTD, many of these clients reported that they were still using Solimar rather than Kokai. FE7 further confirmed that it was well known internally at Trade Desk that use of Kokai was always at or around only 60% at these agencies.

38. Indeed, Kokai is still not fully adopted by all TTD clients or even fully developed. A July 1, 2025, report by *AInvest* confirmed that Trade Desk's statements regarding Kokai adoption were false. Specifically, it reported that one-third of TTD's clients had still not migrated to Kokai by July 1, 2025, "with many clinging to the legacy Solimar platform due to Kokai's steep learning curve."

39. Similarly, a July 24, 2025, *AdExchanger* report explained that Defendant Green's claims in February 2025—including that Kokai was being enthusiastically adopted, and the Company would deprecate Solimar by the end of 2025 because Kokai development and adoption were complete—were false. As detailed in its report, Kokai "will require more time and it is unclear exactly how much," and the "[t]he previous plan to reach full Kokai adoption by the end of 2025 is in doubt . . . ." Further, according to "a source close to The Trade Desk with direct knowledge, [TTD] currently has no concrete plans to deprecate Solimar at all" because "some of Kokai's features are still being developed," let alone fully adopted. Indeed, on August 7, 2025, Defendant Green admitted that still only three-quarters of client spend was through Kokai, and certain Kokai features were still in the beta phase and not even rolled out.

40. In an effort to maintain the ruse of Kokai's quick adoption and immense popularity, the Individual Defendants manipulated how they were counting which

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

clients had "adopted" Kokai. Specifically, the Individual Defendants counted clients who primarily were still working through Solimar, as having adopted Kokai. For example, FE6 explained that, as long as a client's business was available on both platforms, TTD counted the customer as having migrated to Kokai. FE6 further explained that TTD personnel were encouraged by Trade Desk management to simply push certain line items over to Kokai from Solimar, so the client could access the same business on either platform, and then TTD would claim the account had been migrated to Kokai and been "adopted" by the client.

41. Relatedly, to further boost adoption numbers, TTD forced clients onto Kokai, often over their express objections. For example, in the fourth quarter of 2024, as explained by a director of a marketing company for TTD clients, TTD forced certain client accounts to migrate from Solimar to Kokai, despite repeated protests from those clients about the new platform's poor performance. The director's clients began noticing these forced changes in December 2024. FE5 similarly recalled that TTD personnel were encouraged to send clients emails pushing them to adopt Kokai, even when they did not want to switch platforms.

42. Contributing to Kokai's slow adoption was the fact that TTD was suffering from a personnel vacuum during the exact period when such personnel were needed to drive adoption of Kokai.

43. As FE1 explained, key User Experience personnel left shortly after the launch of Kokai. For example, Christine Jennings, the Vice President of Product Marketing, was terminated in September 2023—just weeks after the launch. FE8 explained that this left a vacuum in product marketing leadership during the exact period when such leadership was needed in order to drive adoption of Kokai. Indeed, after Jennings was terminated, there was no senior leader in product marketing for over a year. While FE8's boss, CMO Colley, nominally filled the role, Colley

- 11 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

expressed to FE8 that he did not feel he had sufficient time for those duties. FE7 added that half of the rollout of a program like Kokai is the marketing and how you communicate said rollout; accordingly, a lack of marketing personnel to communicate that rollout had obvious negative impacts on the rate and success of adoption.

**The Truth Regarding the Lagging Adoption**
**was Known or Recklessly Disregarded**

44.     The Individual Defendants knew the truth about Kokai's slower-than-represented adoption. Indeed, multiple TTD former employees explained that the Officer Defendants received regular reports detailing in real-time Kokai's lagging adoption rates.

45.     For example, the Officer Defendants each had access to and regularly reviewed internal Tableau dashboards. FE2 explained that the Tableau dashboards showed which specific clients had transitioned to Kokai and included statistics on how many clients had clicked a "revert to Solimar" button, which the Officer Defendants were monitoring carefully. FE8, who helped develop the Marketing dashboards on Tableau, explained that on Tableau there was an executive level dashboard that had key business metrics. FE8 was told by Trade Desk's CMO Colley that there were also dashboards that tracked Kokai from various perspectives, including adoption metrics, client migration pacing, and feature-level engagement. FE8 was also aware of these dashboards because he was asked by TTD's product marketing team if they could start pulling the Kokai (and other product-related) metrics into their own dashboards. As FE9 explained, she personally observed individuals in client services writing and sending the emails to senior leadership, a level below Defendant Green. FE9 believes that Green also saw the information based on his involvement.

46.     The Officer Defendants also received weekly spreadsheets that detailed Kokai's less-than-represented adoption. FE6 explained that each senior director,

- 12 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including FE6, was responsible for completing a spreadsheet every week that included data pulled by customers, showing the percentage of their business that had migrated to Kokai, and a narrative section outlining what had gone well and what had not during the week. FE6 explained that these weekly reporting spreadsheets were then provided to Defendant Green and other senior executives.

47. FE2 described the same process, recounting how TTD personnel had to rationalize every week why certain clients had not moved over to Kokai from Solimar, which was regularly due to technical conflicts and data integration issues with Kokai (discussed further below). FE2 stated that these client concerns were then reflected in aggregated reports that FE2 knew Defendant Green reviewed weekly, based on Defendant Green's discussion of them at the all-hands meetings (discussed further below) and the urgency with which he was pressing the Kokai adoption issue. FE2 further stated that the Officer Defendants reviewed Tableau dashboards on Kokai's usage and adoption during the weekly all-hands meetings.

48. FE3 also recounted how TTD leadership, including the Officer Defendants, made specific inquiries regarding Kokai adoption rates and performance, and that TTD's BI team, which FE3 was a part of, was under pressure to meet the volume and urgency of those inquiries.

49. Additionally, as discussed above, Trade Desk's CMO, Colley, received a report in December 2024, detailing why Kokai's adoption was so slow.

50. Kokai's slow adoption by TTD clients was also regularly discussed within TTD.

51. Multiple former employees confirmed that Kokai's lower-than-represented adoption rates were discussed in weekly all-hands meetings which were led by Defendant Green and attended by Defendants Schenkein and Jacobson:

   a. FE3, who attended these meetings, confirmed that Defendant Green and others acknowledged the need to push adoption and shared actual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

adoption percentages during these meetings.

b. FE10, who also attended these meetings, likewise recalled Defendant Green saying during all-hands weekly meetings throughout 2023 that Kokai was behind schedule.

c. FE8, who also attended these meetings, added that Kokai was a regular topic of discussion during these weekly all-hands meetings. FE8 confirmed that, from Kokai's launch through FE8's departure in 2025, Defendant Green and other company leaders spoke at these meetings about Kokai, including its adoption rates, the need to increase certain metrics with clients, and updates on when certain product features would be launched. FE8 explained that Defendant Green demonstrated deep knowledge of the actual status of Kokai and its adoption at these meetings, and clearly was familiar with detailed metrics on these topics.

d. FE2, who also attended these meetings, noted that during the meetings, the Officer Defendants reviewed Tableau dashboards on Kokai's actual usage and adoption.

52.     In addition, FE8 had multiple conversations with leadership, including TTD's CMO Colley and various sales leaders and the BI team, in which they confirmed Kokai's lagging adoption and sales performance. Colley also informed FE8 that he and Defendant Green spoke regularly on the subject of Kokai adoption.

53.     Additionally, FE4 sat next to Uddin—the SVP of Technology after Dave Pickles's departure who reported directly to Defendant Green—who regularly told FE4 that Kokai's adoption was slower than the Company was publicly projecting. FE4 confirmed that Uddin and Defendant Green had repeated conversations regarding the Kokai rollout and slow adoption.

**Kokai Suffered from Serious Issues and Defects**

54.     At all relevant times, the Individual Defendants repeatedly claimed that Kokai was quickly adopted (and therefore driving revenue), largely because it offered a simple and effective interface with the features clients needed, streamlined first-party data integration, and other improvements over predecessor and competitor products.

55.     For example, during the scripted portion of Defendant Green's remarks

- 14 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

on the February 15, 2024, earnings call, he highlighted Kokai's Relevance metric, stating that:

> Kokai represents a completely new way to understand and score the relevance of every ad impression, across all channels. It allows advertisers to use an audience-first approach to their campaigns, targeting their audiences wherever they are on the open internet. Our AI optimizations, which are now distributed across the platform, help optimize every element of the ad purchase process.

56.    Similarly, during TTD's first quarter 2024 earnings call on May 8, 2024, Defendant Green touted Kokai's suite of cutting-edge tools—including "relevance scoring, forecasting, budget optimization, frequency management, or upgraded measurement"—which were "bringing the power of AI to a broader range of key decision points than ever . . . ."

57.    Just a week later, on May 17, 2024, during a panel discussion at the DMS by Luma Conference, Defendant Jacobson also touted Kokai's feature called the "Sellers and Publishers 500 Plus," which purportedly identified the best publishers with whom to place ads, claiming that component was "pulling together the best access of inventory across the open internet to make it easy for advertisers to buy in a brand-suitable way that still transparently delivers performance." Defendant Jacobson also touted Kokai's use of first-party data to drive more efficient ad-buying, stating "[w]e . . . recognize the value of machine learning or AI which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear."

58.    On August 8, 2024, during TTD's second quarter 2024 earnings call, Defendant Green again touted the purported performance improvements its clients purportedly enjoyed on Kokai, claiming that "incremental reach is up more than 70%," "[c]ost-per-acquisition has improved by about 27%." He claimed that:

> [P]erformance metrics have improved by about 25% helping to unlock performance budgets on our platform for years to come. So our clients

- 15 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

are getting more precise, more cost efficient, and then they're able to reinvest for even more reach and drive a much better return on ad spend.

59.    Specifically, Defendant Green touted the supposed efficient data-seeding process on Kokai, stating: "Kokai allows our clients to deploy data about their most loyal customers, and then use that data as a seed to grow and harvest the next generation of loyal customers."

60.    Similarly, during the scripted portion of his remarks of the Company's November 7, 2024, earnings call, Defendant Green touted Kokai's innovations, which were supposedly "helping advertisers identify and target new potential customers with much greater precision." He further represented that, as a result of "[i]nnovations in Kokai," customers' "[d]ata elements per impression continued to increase," which was "significantly" improving performance.

61.    And, at the February 12, 2025, earnings call, Defendant Green again touted the supposedly uniformly positive feedback TTD was receiving from clients on Kokai, claiming that "[w]e are producing case study after case study as clients continue to lean into the features of our Kokai platform, every one of them showing the enhancements and effectiveness that goes up with the use of Kokai."

62.    The positive claims regarding Kokai's supposed performance and interface mattered to financial analysts and the market. For example, on February 26, 2024, a *MarketBeat* article reported that Kokai was "enhanc[ing] programmatic advertising buying by providing an intuitive user experience . . . ." On May 29, 2024, *AdWeek* likewise reported on TTD's publication of the 100 top publishers featured on Kokai's Sellers and Publishers 500 Plus tool, quoting TTD's Vice President of Inventory Development Will Doherty as saying the 500 Plus list—which clients could now toggle "on" or "off" when using Kokai—was "where the best shows, content and journalism lives." Once again, on August 8, 2024, Piper Sandler highlighted the Company's representations that "[t]he Kokai roll-out appears to be driving real

- 16 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

improvements for advertisers, with performance metrics improving by ~25% across the platform," and on August 9, 2024, Wedbush reported that "[f]or campaigns that have moved to Kokai, The Trade Desk has observed a 70% increase in incremental reach while cost-per-acquisition improved ~27%." And the next day, a flurry of analyst reports from Piper Sandler, Wedbush, and others, echoed the same enthusiasm about Kokai's purported performance.

63. Likewise, on September 18, 2024, Insider Monkey reported, based on the Company's representations, that "[Kokai's] early results have been encouraging, with the campaigns holding an incremental reach of more than 70% after moving to Kokai" and "[p]erformance metrics across the company have also improved by 25%," which "translates to more cost-efficient and precise clients." Similarly, on December 23, 2024, a report by analysts at Zacks emphasized, based on the representations, that "TTD's Kokai solution is helping advertisers identify and target new potential customers with much greater precision."

64. In reality, the Individual Defendants concealed from investors that Kokai had numerous and serious product defects that prevented clients from performing key functions and made Kokai worse than Solimar and competitor products, thereby impeding adoption and revenue growth.

65. TTD's stated value proposition was that its platform helps clients place ads efficiently—*i.e.*, it garners the most impressions with the highest quality audience at the lowest price. The critical metrics by which this is assessed are referred to as "Key Performance Indicators" or "KPIs." Given the importance of these metrics to clients, the Individual Defendants repeatedly touted the KPIs for Kokai—but the truth that the Individual Defendants concealed from investors and the public was that many of the KPIs were totally unreliable, not offered in Kokai, or still in development.

66. "Relevance": One of Kokai's purported key KPIs was "Relevance,"

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which Defendant Green repeatedly touted. Relevance is supposed to measure how similar the audiences an advertiser is reaching are to the audiences an advertiser intends to target. For example, an advertising campaign for Depends diapers that reaches men ages 18 to 25 might include a high "reach" metric (the number of consumers who have seen an ad), but the relevance score should be abysmal, because young men are not the target audience for the product Depends is selling.

67.     In January and February 2024, FE1 was tasked with developing a metric on top of the Relevance data infrastructure to show clients in Kokai how relevant their reached audience was to a target audience. To do this work, FE2 needed a population that was known to be highly relevant, and a population that was known to be highly irrelevant and needed to ensure that Kokai would correctly measure the former as having high Relevance and the latter as having low Relevance. FE1 explained that a failure to pass this test would indicate that the Relevance metric was not performing reliably and consistently.

68.     To test the accuracy of Kokai's Relevance metric, FE1 proposed a model to capture how sensitive the Relevance infrastructure was, as it is not possible to create a meaningful metric on top of machine-learning or AI models like those used in Kokai if the underlying model's sensitivity is unknown. FE1 understood no such model to test the sensitivity of the Relevance metric existed at TTD. FE1's proposal was never implemented and, prior to leaving in mid-2024, FE1 was not aware of any such sensitivity analysis for the Relevance metric—whether using his approach or a different approach to ask the same question. FE1 explained that without knowing how well calibrated the Relevance metric was, one could not say anything about how well Relevance performed.

69.     FE1 explained that two data science teams responsible for parts of Relevance were regularly arguing over whose proposed method was better and would

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

eventually be utilized. There were regular arguments in meetings between the teams, which FE1 knew about from conversations he had with data scientists and product managers who were present during those meetings. (One such contentious meeting occurred in early-to-mid summer 2024 in Boulder, Colorado.) The attendees of the meetings that FE1 spoke to said that it was expressed in these meetings that the Relevance models did not work in a predictable and stable fashion in many scenarios in Kokai. These meeting started in May 2024 and were held throughout the summer of 2024. FE1 explained that the data science teams were taking the Relevance issues to the product teams, who informed Defendant Green of the instability problems. FE1 explained that, because the relevance score might not accurately reflect how relevant the reached audience was relative to the desired target audience, the reliability of targeting for advertisements could not be guaranteed.

70.    Programmatic Guarantee Deals: Worse yet, Kokai's interface did not support "programmatic guarantee" deals, which are a highly popular method of purchasing ad space for TTD clients. Such deals are highly popular because they permit clients to contract with a publisher to buy a certain volume of ad slots at a fixed price. Programmatic guarantee deals are especially attractive because they assure clients that their ads will be placed somewhere.

71.    FE1, FE5, and FE9 confirmed that Kokai did not support programmatic guarantee deals and, because of that, customers resisted transitioning to Kokai.

72.    As one TTD client explained on July 25, 2024, TTD representatives were "pushing [Kokai] but we probably won't be looking to migrate our large evergreen campaigns until after the holidays," because of the lack of programmatic guarantee deal functionality. An *AdWeek* article dated March 11, 2025, entitled "Struggling Product Behind The Trade Desk's Revenue Woes Angers Buyers and Publishers," similarly explained, based on conversations with ad buyers, that one of the key

- 19 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

problems with Kokai is that it "doesn't support programmatic guaranteed campaigns—where a publisher reserves ad inventory for an advertiser at a pre-negotiated price." As *AdWeek* explained, such deals "are a staple for agency buyers," and Kokai's inability to provide for "them is 'just insane' . . . ." An *AdWeek* article dated August 11, 2025, entitled "Exclusive: Marketers Move Millions in Ad Spend from The Trade Desk to Amazon's Ad Platform" likewise explained that Kokai's inability to support programmatic guarantee deals was one of the chief reasons that Trade Desk lost business and revenue to its competitor, Amazon.

73.    Sellers and Publishers 500 Plus: Despite the representations, Kokai's "Sellers & Publishers 500 Plus list"—a list of trusted publishers that advertisers could purportedly connect with directly through a pipeline called OpenPath, and via other SSPs—did not actually function. Specifically, it did not identify the highest quality publishers with which to advertise. As one Kokai client reported, he had done "a bit of A/B testing," to quantify whether that feature offered any improved performance, and it did not "out perform[ the] open market." In other words, turning on the feature that TTD had developed and touted had no impact on clients' ad campaign performance.

74.    The Officer Defendants had direct knowledge of Kokai's deficiencies. Not only was Defendant Green directly informed about the Relevance metric issues, but through the Tableau dashboard, the Officer Defendants requested and had access to KPI data that showed these metrics did not work as represented. FE3 explained that from at least mid-2024 through early 2025, Defendants Green, Schenkein, and Jacobson had explicitly requested and received access to KPI changes over time through the Tableau dashboard.

75.    These poor KPI results were further confirmed through direct client feedback. For example, FE2 stated Defendant Green's representations about Kokai's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

performance was based on selectively chosen data. FE2 stated that senior Vice Presidents at TTD would relay requests from Defendant Green and other executives for FE2 and others to find client success stories—rather than representative reports about the range of client experiences—but, in the first half of 2024, client services couldn't find any. FE6 confirmed that, during FE6's tenure at the outset of the Kokai rollout, there was no clear evidence of performance improvement over Solimar. And the director at a marketing company, who oversaw fifty clients' use of Kokai, recalled never seeing the function and management capabilities that TTD touted. As FE2 put it, Kokai failed to deliver on performance; it was quite painful when the platform underserved clients that had been pushed to adopt it, and this happened often.

76. Because of Kokai's inability to improve performance, FE6 explained, Kokai was not a growth strategy—ever.

77. A March 19, 2025, *Digiday* report confirmed that Kokai's significant deficiencies resulted in the Company's inability to reel in clients away from competitors such as Mediaocean, noting that "[w]hile Kokai was designed to shift linear budgets into programmatic, agencies aren't eager to juggle another platform, especially when their core operations are so tightly woven into Mediaocean's systems." A March 24, 2025, article in *ADOTAT* similarly described Kokai as "the AI-fueled interface that was supposed to be TTD's shiny new Tesla but feels like someone sold you a DeLorean with a busted flux capacitor." That article, comparing Kokai to a "UX Escape Room," described Kokai as "like Ikea instructions in a different language."

78. Also unknown to investors, Kokai was unable to "seed" the platform because it could not effectively integrate first-party data for many industries.

79. First-party data is data that a company collects on its customers through purchase, search or viewing history. It can include such things as demographic

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

background, spending habits, and personal and political interests. If first-party data were effectively integrated into Kokai, advertisers would be able to use that rich data set to specify which types of customers the client would like to target in its ad campaign, using parameters like age, location, and spending habits. Then, Kokai could comb through that data to find patterns, which it could then use to find other customers in its vast databases that were likely to exhibit similar behavior—a process called "seeding." Through this process, clients could define the ideal audience for their ad campaigns and get their ads to the right audience. As FE11 explained, the ability to seed was the most important part of Kokai because it changes how effectively Kokai's algorithm functions.

80.    The Individual Defendants told investors that, with Kokai, clients could "seed" a target audience to make their ad campaigns more effective. For example, during their second quarter 2024 earnings call on August 8, 2024, Defendant Green touted that "Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers."

81.    But in reality, clients in key sectors were unable to integrate their data and, thus, utilize the seeding functionality.

82.    FE6, FE11, and FE2, for example, confirmed that Kokai was unable to integrate the first-party data of healthcare sector companies into its platform. Healthcare sector clients were among TTD's largest and most substantial client base. FE11 explained that pharmaceutical client data (like other data in the healthcare sector) is highly sensitive and has restrictions regarding the use of such data as seeds. Accordingly, as FE11 explained, because TTD could not integrate such data onto its platform, TTD resorted to utilizing "dummy" (*i.e.*, fabricated) seeds to inform the Kokai algorithm for pharmaceutical sector clients.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

83. FE6 and FE11 confirmed that this inability to integrate healthcare sector customer data into the platform impeded healthcare sector client spending on Kokai, since those clients were unable to leverage the full scope of seeding. For example, FE6 explained that potential partners in the healthcare sector, like Crossix, have certain key medical information, but that information was not integrated into the platform, and thus TTD's clients did not have access to their audiences. FE6 confirmed this deficiency persisted until FE6 left Trade Desk in August 2024, and FE11 confirmed that it persisted as late as March 2025, when FE11 left the Company.

84. TTD's inability to integrate healthcare sector clients into Kokai had a detrimental impact on TTD's revenue. As TTD touted in multiple investor presentations, including both the second and third quarters of 2023, healthcare-related advertisers were a top three spender in both 2022 and 2023 for the Company, making up 11–12% of spend for TTD in each year. Accordingly, a slow-down in adoption and spending in that sector had an outsized impact on the Company's overall bottom line.

85. Relatedly, as 2024 was an election year, investors believed that political spending was a boon to TTD—as Defendants Green and Schenkein told investors multiple times. For instance, on the Company's fourth quarter 2023 earnings call, Defendant Green stated that "2024 stands to be a major year for political spending here in the United States."

86. But, untold to investors, Kokai's inability to seed data significantly impeded political advertising through TTD. FE4 explained that political sector clients were unable to transition to Kokai due to a combination of technical and compliance issues and, as a result, were forced to remain on the legacy Solimar platform. Thus, those clients continued to deal with the same shortcomings in political ad workflows that had existed—and about which they had complained—in the previous election

- 23 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cycle, despite the claims that Kokai was a next-generation solution. From FE4's conversations with Client Services, these workflows were deeply frustrating in the 2020 and then again in the 2024 election cycles.

87. In addition to being unable to integrate the first-party data to seed data from key industries—contrary to the claims of Kokai's "incredible" data integration—FE11 stated that as late as the end of 2024 Kokai's seed process was still so confusing to TTD clients that they did not even know how to use it. FE5 explained that TTD was opaque and ambiguous about how seeding worked, which bred skepticism in potential clients. FE5 added that clients were also reluctant because TTD sales personnel were also not fluent or confident in how seeding worked on the platform.

88. An additional impediment regarding data integration was that clients did not want to pay for the data that had been integrated. FE4 said clients often objected to TTD's promotion of proprietary data products like seeding—which TTD charged a fee for—because they carried additional, undisclosed costs.

89. Kokai's ability to integrate first-party data to seed the platform was also significantly hampered by Trade Desk's failure to be transparent regarding Kokai's algorithm inputs. Transparency, FE4 noted, was an issue that came up repeatedly with customers, as they were regularly surprised by hidden fees associated with recommended functionalities. One Kokai client expressed a similar conclusion, stating on November 20, 2024, that TTD was "not particularly transparent" regarding how fees and features worked, and instead, as another client noted, "tack[ed] on" fees. Another Kokai client commented that same day that TTD's "whole model is excessive fees." According to FE7's research, among the things participants did not like about Kokai was the lack of transparency around platform fees.

90. This lack of transparency was further highlighted when, on March 28,

- 24 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2025, the Trade Desk was sued by consumers for its improper use of UID2—the identification system TTD developed for tracking consumers—alleging significant privacy violations. As industry leaders and commentators have observed, TTD's approach to identifying consumers represented a new low for the ad tech industry: "From a purely technical standpoint, [UID2 is] a regression in privacy in that [it] allow[s] tracking of users who are presently protected against tracking."

91. FE2 confirmed that Defendant Green and other TTD executives were kept apprised of these data integration challenges through Tableau reporting and regular updates through the chain of command.

92. Also unknown to investors, Kokai was unreliable and did not pass basic tests necessary to confirm it was working properly. FE1 explained that an A/A test creates two separate but identical environments in which the software—in this case, Kokai's bidding optimization—runs. If the optimization is stable, the two identical environments should produce identical bidding behavior and results; if they do not, it means the Kokai software is producing random, inexplicable results. FE1 explained that Kokai was often unable to pass a simple A/A test, and that the Officer Defendants knew that. In other words, because Kokai would produce two different bidding results under identical scenarios, the Kokai platform was producing random, uncontrollable results. That is, rather than spend advertisers' money in an optimized way, Kokai would instead make random decisions about how to bid for ad space.

93. To conceal Kokai's fundamental product defects and falsely reassure investors, the Individual Defendants touted metrics that were manipulated or meaningless.

94. One such metric was "incremental reach," which measured how many consumers an ad was reaching for the first time. FE1 explained that Defendant Green's statement on August 8, 2024, that "incremental reach is up more than 70%"

- 25 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

was misleading because, internally, incremental reach was always discussed and measured on a campaign-by-campaign basis. Accordingly, Defendant Green had no accurate basis for touting Kokai's incremental reach in the aggregate—*i.e.*, over multiple campaigns—like Defendant Green purported to do during the second quarter 2024 earnings call, given the different combinations of settings and different levels of aggressive pricing. FE1 explained that there are many settings that can affect incremental reach, and as such, Defendant Green was touting a meaningless and inaccurate metric by stating that incremental reach was "up more than 70%."

95.    Another of the manipulated metrics was "cost per acquisition." FE5 explained that Defendant Green's statement on August 8, 2024 that Kokai's costs per acquisition KPI had "improved by about 27%" was misleading because Defendant Green was inaccurately attributing to Kokai a reduction in cost due to other things, like seasonality (*i.e.*, the time of year when the ad campaigns were being run), creatives (*i.e.*, the quality of the ads themselves), audience, or what the opposition trader did during an ad buy. As FE5 explained, without a proper A/B test set up to determine what actually drove the reduction in cost, Defendant Green was just touting a number that was easily manipulated, rather than statistically rigorous, in order to persuade clients to adopt Kokai.

96.    Also unknown to investors, Kokai suffered from significant problems with pacing, *i.e.*, how a client's money was spread out over a campaign's lifecycle. Pacing is an important aspect of programmatic advertising—as indicated by TTD's own publication of an article titled "Improve pacing and Decision Power from the Programmatic Table"—but if Kokai's ability to efficiently spread ad spending over the course of a campaign (referred to as pacing) is broken, it can result in ad campaigns spending money too fast (*i.e.*, bidding too much for earlier ad slots, and thus paying more money for lower quality impressions) or too slowly (*i.e.*, not bidding

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

enough, leaving advertiser money on the table and failing to get ads placed).

97.   FE1 confirmed that Defendant Green was in meetings with product managers where Kokai's pacing problems were discussed. FE1 learned this from a product manager who he sat next to and was in the meetings wherein Defendant Green and the product managers talked about issues with Kokai causing the delays. FE1 said that it was in the second quarter of 2024 when he was told by a colleague that Defendant Green was aware of Kokai's pacing issues, and that this was hampering Kokai adoption.

98.   In addition to the above-mentioned product defects, Kokai's interface was unnavigable and created significant inefficiencies for clients that deterred them from adopting and spending on the platform. Kokai's interface—which was premised on chemistry's periodic table of elements—was concocted by Defendant Green in defiance of his marketing and product design personnel. Unsurprisingly, then, the interface was confusing, tremendously unpopular with TTD clients, and deterred (rather than facilitated) increased spending on Kokai.

99.   FE1 confirmed that Defendant Green explained in a weekly all-hands meeting that his 14-year-old son had told him to base Kokai's design on the periodic table of elements, and that the UX & UI team was instructed to execute that vision. FE1 added that several people on the UX & UI team were irritated at this decision, and some quit as a result of it. UX & UI personnel expressed that they had told Defendant Green that basing a 21st century software interface on a hundred-year-old table based on atomic chemical properties violated basic user interface and user experience principles.

100.   These were not simply aesthetic concerns; customers reported that they directly impeded functionality on Kokai. As was later publicly reported in an *Ad Tech Explained* article, Kokai's new interface significantly disrupted the regular workflow

- 27 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for ad traders, forcing TTD clients to use Solimar and slowing down the adoption of Kokai. Indeed, FE2 confirmed that, rather than being perceived as an upgrade over Solimar, Kokai's periodic table exacerbated the challenge of switching clients to Kokai: rather than simplifying the user experience with fewer clicks, basic user functions became more complex.

101. As early as Kokai's launch in June 2023, the Individual Defendants knew that its clients were dissatisfied with Kokai and that the interface deterred adoption. For example, the director, who worked since 2023 at a marketing company which oversees 50 clients with TTD accounts, explained that the director's clients were given the option to adopt Kokai in June 2023—but abandoned it within two months because, as the director's company reported to TTD, Kokai's interface made no sense and caused significant problems for users, as it was illogical as to navigation and performing basic tasks.

102. Indeed, the director of the marketing company was part of an independent focus group created by Trade Desk in March 2024 to obtain opinions on Kokai. This focus group was recorded, and the director provided verbal comments during the focus group about how the user interface and user experience made no sense, and the director's trouble navigating it. The director recalled that the director's marketing company "hated [Kokai] with a passion." The director confirmed that part of the problem with Kokai was that functions available in Solimar were not available in Kokai, and if they were, they were not designed and explained in a logical way that was easy to navigate and locate. As the director put it, a task that took 15 minutes in Solimar now took 45 minutes in Kokai, causing clients to lose a half hour of billable hours.

103. A senior manager at Havas, a French advertising company, and two assistant directors at Spark (another advertising company) and Digitas (an ad

- 28 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

agency)— with whom the director conversed in late 2024 and early 2025—also shared these grievances with Kokai. The representative from Havas said that the Kokai user interface and user experience made absolutely no sense and was crippling their manpower hours since it took two-to-three times as long to do simple tasks, which the Havas employee told TTD representatives.

104. Similarly, according to FE4—TTD's Vice President of Global Support & Ad Policy Operations from December 2019 to December 2024—Defendant Green knew that Kokai lacked any discernible workflow. FE4 learned this from conversations with Uddin, the SVP of Technology, and from what Green said during internal meetings towards the end of 2023. FE4 explained that clients were presented with "programmatic table" tiles but had no clear direction on how to navigate or link actions together. FE4 recalled, as one example, that clients could not easily clone settings across multiple ad campaigns without encountering numerous bugs. As another example, clients were unable to perform certain actions within the platform's front end, and FE4's team completed those tasks manually through support tickets.

105. FE2 similarly confirmed that, throughout FE2's tenure at TTD (2023 to mid-2024), clients suffered issues including incompatibility with third-party tools to fundamental bugs and missing features. And FE5 confirmed that Kokai's platform was buggy and unfinished up until the time FE5 left in August 2024, recalling the same cloning issue that FE4 raised. FE5's understanding is that even in December 2024, the bugs persisted. FE5 explained that these bugs discouraged clients from engaging with the platform throughout 2024.

106. Indeed, despite the claims that Kokai was an upgrade, Kokai actually reduced functionality from Solimar in certain key respects. As one Kokai user wrote in an internet post on June 13, 2024, "[b]asic functions are buried deeper in the UI [user interface] than ever before, some features of the last UI are missing entirely."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Another Kokai client agreed on July 25, 2024, writing that Kokai was "[c]urrently not [useful]" because basic functionality like "Bulk cloning Campaigns / ad groups and changing budgets are not possible on kokai." Changes for the worse included limited column customization, which made it harder for clients to pull key reports and monitor metrics and the inability to bulk edit, as described by FE5 and FE4.

107. FE3 and FE6 also independently confirmed that Kokai introduced confusion for clients and, as a result, they were resistant to move to the new platform. As FE6 put it, rather than being pulled onto the platform through new features and an enticing interface, clients were being pushed onto the platform. FE3 said acclimating to the interface complexity was like trying to learn multiple languages at once.

108. As one client put it on June 13, 2024, clients had:

> [B]een handed a UI [user interface] without the most essential metrics necessary to managing campaigns . . . . Honestly, it's very concerning how out of touch this has become and seems to be driven by their controlling shareholder/founder. . . . [T]he fact this thing hit Beta without a clear way to build a new advertiser or build a new campaign on the front page . . . . well I don't know how to explain that other than it being a clusterfuck project.

109. The Individual Defendants were well aware of these serious product defects. For example, Defendant Green made clear in a February 15, 2024, earnings call that he had just been on a "world tour" across four continents to talk to customers about Kokai because he was "concerned that the amount of change would make [clients] afraid of adopting something new simply because of how much it changed . . . ."

110. Moreover, multiple former TTD employees confirmed that Kokai's deficiencies and interface challenges were well-known and openly discussed at TTD, including with the Officer Defendants.

111. As discussed above, many of these deficiencies were discussed in Tableau reports and other communications to the executive directors, as well as in the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

weekly all-hands meetings.

112.    Further, FE1 confirmed that TTD employees talked openly about the poor design of the Kokai interface, including data science and end-product employees. FE2 similarly confirmed that his team provided the Officer Defendants with qualitative descriptions of client experience with the user interface, which included detailed client accounts of frustrations with Kokai's interface through reports that went through TTD's senior client service Vice Presidents directly to the Officer Defendants and other TTD executives.

113.    The Officer Defendants also knew about these deficiencies because, as FE8, FE2, and FE10 explained, they monitored online discussion of Kokai, which included critiques of Kokai's interface and platform.

114.    The fundamental defects in Kokai's platform were significant for the Company's revenue growth. Each month that went by where Kokai was not functional or where clients were struggling to or deterred from increasing their use of it, TTD left revenue on the table. In the meantime, clients shifted their advertising spending to TTD competitors. As TTD's own Chief Revenue Officer, Jed Dederick, stated under oath during Google's antitrust trial, TTD was constantly competing with other demand-side platforms ("DSPs") (*i.e.*, other companies that help advertisers buy ad space). When asked under oath at an unrelated trial whether any customers use TTD "as their only demand-side platform," Dederick replied:

> Typically, no. . . . typically, an advertiser who works with The Trade Desk will also work with those other demand-side platforms to have access to highly valuable inventory [not available on TTD], like YouTube [or Amazon].

115.    And that is precisely what TTD's clients did. Former employees confirmed TTD clients were not adopting or growing their spend on Kokai and instead were buying ads elsewhere.

- 31 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

116.  For example, FE8 understood from colleagues in Client Services and Trading that TTD clients, including some of TTD's larger clients, voiced concerns about Kokai. For example, FE8 was told that one of the company's larger clients, a major multinational seller of consumer-packaged goods, was transitioned onto Kokai but had concerns including that Kokai was poorly designed, the results were not compelling, and they did not want to increase spend.

117.  FE12 likewise stated that, as a result of frustrations with Kokai, certain TTD customers split their budgets across multiple platforms and adopted DSPs that better suited their needs, like StackAdapt and Basis, rather than using just TTD.

118.  FE1 also confirmed that he knew of TTD clients who were pulling their budgets off Kokai.

119.  An *AdWeek* article dated August 11, 2025, entitled "Exclusive: Marketers Move Millions in Ad Spend from The Trade Desk to Amazon's Ad Platform" further corroborated that advertisers were shifting millions of dollars in ad budgets from Trade Desk to Amazon, in part, due to TTD's deficient "user interface" and Amazon's "greater measurement visibility." The *AdWeek* article highlighted the following material moves from Trade Desk to Amazon as a result of Kokai' deficiencies: (i) a global auto brand moved approximately $80 million in annual ad spend by the end of 2025 Q1;(ii) a global tech brand that redirected nearly $5 million of ad spend; (iii) 30% of an ad agency's clients who shifted the bulk of their CTV and display budgets, particularly around Thursday Night Football; (iv) 30% of an ad agency's clients shifted 100% of their total annual ad budgets between February and August 2025; and (v) 40 brands at Tinuiti who moved 12% of their budgets from DSPs like TTD; and (vi) 80% of PMG clients shifted tens of millions in CTV budgets away.

- 32 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The Truth Emerges**

120.   Beginning in early 2025, the truth emerged to investors: the product TTD had spent years touting as an effective and highly productive platform with a user-friendly interface that was quickly adopted by clients and driving revenue was not the marvel the Individual Defendants claimed. In reality, existing clients were not adopting Kokai at the speed or rates the Individual Defendants claimed; those clients who had transitioned to Kokai were not increasing their advertising spend; and there were significant defects with Kokai that impeded its performance and effectiveness. The result was catastrophic for TTD's bottom line and ultimately its investors.

121.   On February 12, 2025, after market close, TTD issued its fourth quarter 2024 results and—for the first time in the Company's history—TTD fell far short of its stated revenue expectations of $756 million, as well as analyst consensus expectations of $758 million.

122.   In an earnings call that same day, Defendant Green explained that Kokai execution errors and slow adoption was the cause of the revenue miss. The Individual Defendants partially revealed what they had known throughout the past fifteen months: TTD "stumbled" due to "execution missteps." Defendant Green was forced to admit that "Kokai rolled out slower than we anticipated" and that, because the Company had not yet reached full adoption of Kokai, "today we're maintaining two systems, Solimar and Kokai." Defendant Green was further forced to add that "[s]ome clients are still transitioning from our previous platform" and that the revenue miss was not due to macro-economic factors or issues out of their control. Rather, the Individual Defendants were required to admit that the miss was "our fault," with the Company forced to take "full ownership of the shortfall." As Defendant Green acknowledged, "this miss was not due to a lack of opportunity or increased competition; it was on us."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

123. On this news, TTD's stock plummeted over 30%, from a high of $122.23 on February 12, 2025, to just $81.92 at close on February 13, 2025, the largest single day market cap drop in the Company's history. Overnight, billions in market capitalization evaporated.

124. Notably, in contrast, TTD's competitor AppLovin saw a major stock surge on February 13, 2025, reflecting that TTD's clients were turning to competitors who could absorb spend clients were no longer willing to invest in TTD, as reported by an *Ad Tech Explained* article dated April 1, 2025.

125. Analysts were stunned and concerned about Kokai and its drag on the Company's revenue. RBC analysts underscored "a slower than expected deployment of Kokai, falling short of its expectations to reach 50% of its install base and impacting results." Cantor and Jefferies analysts agreed, highlighting on February 12, 2025, the direct relationship between Kokai and the revenue miss, with the former reporting "slower rollout of Kokai (missed 50% EOY adoption goal) also weighed on 4Q revs," and the latter noting that it was a "primary reason[] for the miss." Jefferies further reported that "the slowdown from the Q3 call in November to late December is certainly cause for concern." *AdExchanger* echoed on February 12, 2025, that investors were unwilling to take the earnings miss as merely a "one-off."

126. A February 18, 2025, *Marketing Dive* article concluded that the revenue miss was as an example of "where breathless hype has not always matched the reality of what is often a timely and resource-intensive implementation process for a technology that has a lot of kinks to iron out."

127. Faced with this backlash, and in an effort to assuage concerned investors, Defendant Green claimed—falsely—that Kokai's slow adoption was a deliberate, strategic decision the Company had purportedly chosen to embrace, rather than the result of significant issues with the product. Defendant Green claimed that "the slower

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Kokai rollout was deliberate" and "for good reason." Defendant Green further promised investors that most customers had "already" converted to Kokai and that TTD would "move 100% of our clients to Kokai this year." He further touted the interface and its superiority to prior products, claiming "Kokai is more effective in almost every way." He further assured investors that "we are producing case study after case study as clients continue to lean into the features of our Kokai platform, every one of them showing the enhancements and effectiveness that goes up with the use of Kokai."

128. These representations reassured many analysts and investors. For example, RBC reported that "Management attributed the softness to small execution missteps while seeing no change in the market opportunity or competitive environment." Analysts at Truist noted that TTD "is constantly iterating on Kokai given the level of sophistication the new platform brings, and as a result, decided to roll out Kokai slower than it anticipated in order to optimize performance for each client." Despite lowering their 2025 revenue expectations, Jefferies also reported that it remained long-term "fundamental fans" of TTD. And Oppenheimer reported that:

> [w]hile bulls will do some soul-searching, we think the story is intact . . . . We lower our target to $115 from $135, but maintain our Outperform rating.

129. A month later, the truth about what the Individual Defendants had euphemistically deemed "execution missteps" was revealed for what it really was. After markets closed on March 11, 2025, *AdWeek* published an exposé based on interviews of twelve industry insiders—including two ad publishers, a tech partner, and nine brand and agency ad buyers who used TTD as their primary DSP. The exposé revealed that, contrary to Defendant Green's assurances, Kokai performance was not what the Individual Defendants claimed.

130. The *AdWeek* article described how, rather than driving growth through

- 35 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

its improved performance—as the Individual Defendants had touted—Kokai "greatly reduced the use and function of The Trade Desk's buying platform." The report described how Kokai had been met with "widespread resistance among media buyers." The report further detailed how the new interface was "not intuitive"; rather, it "force[d] media buyers to learn an entirely new workflow that feels disconnected from industry norms." It further noted that:

> Just as The Trade Desk needs publishers to sign onto Kokai so it can have a lot of unique supply, it also needs advertisers as the demand source. But the ad buyers ADWEEK spoke to were reluctant to use it.

131. Notably, in connection with the article, and as further evidence that the Company was knowingly concealing the truth from the market, the Company refused to answer *AdWeek's* basic question of how many clients had currently migrated to Kokai.

132. While the *AdWeek* article sat behind a paywall, over the following two days, it began to cause a frenzy on social media. At 2 PM on March 12, Karsten Weide, an ad tech expert with thousands of followers on X (formerly known as Twitter), tweeted out the article with the word, "Ouch." On March 13, NBC's VP of Programmatic Demand Trey Titone, who later called the *AdWeek* article "scandalous," tweeted a screengrab of the programmatic table of elements, sarcastically referring to it as "what peak UX design looks like." Also on March 13, Twitter account @101Programmatic—an account devoted to programmatic advertising—reacted to the *AdWeek* story and posted its own thread, titled "What's wrong with TTD Kokai?" and posted a series of critiques with Kokai's design.

133. The *AdWeek* exposé revealed what many inside TTD had known for almost two years: Kokai was not a state-of-the-art, revolutionary ad selling technology, but instead a defective platform—built upon a wholly untested design with unstable performance indicators—which clients refused to voluntarily adopt.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

134.   On this news, TTD's stock price cratered further, falling over 11%, from $60.63 on March 11, 2025, to $53.88 on March 13, 2025.

135.   But, again, the Individual Defendants made a series of false statements designed to calm investors. For example, at TTD's first quarter earnings call of 2025, on May 8, Defendant Green claimed—falsely—that "[t]he core of Kokai has been delivered, and adoption is now ahead of schedule." Defendant Green further reassured investors by adding that "[a]round two-thirds of our clients are now using it and the bulk of the spend in our platform is now running through Kokai." Defendant Schenkein concurred, stating the Company's results were due to the "the strength to the uptake in Kokai adoption." As a result, TTD's stock rebounded, jumping nearly 19% from market close on May 8 to market close on May 9.

136.   Finally, after market close on August 7, 2025, TTD released its second quarter 2025 earnings, revealing the full truth, including further delays in Kokai's adoption and an expected slow-down in revenue. These revelations obliterated any notion that Defendant Green correctly described the challenges with Kokai in February 2025 as "small" execution missteps. Specifically, Defendant Green was forced to admit that only three quarters of Trade Desk's client spend was on Kokai, and that key Kokai features were still not developed, including a feature intended to address the pacing issues described above, as well as performance. Rather, client spend on Kokai as a percent of overall spend had increased only 8% as compared with TTD's previous earnings report. Additionally, TTD announced that Defendant Schenkein was abruptly leaving the Company. Defendant Schenkein, who was with Trade Desk for 12 years, is only in her early 40s and not near retirement age and had not indicated that she was leaving to take a position at another Company. Atypical for a situation in which a CFO is leaving a Company voluntarily for a position at another Company, Defendant Schenkein is staying on at Trade Desk in a non-executive

- 37 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

capacity for 4 months, and the CFO position is being transitioned in less than 2 weeks to a current Trade Desk board member with no experience serving as a CFO.

137. Investors and the market were shocked by the slowdown in TTD's growth rate as a result of poor Kokai adoption. Following the August 7 revelations, several analysts downgraded the stock; Bank of America downgraded TTD's stock from Buy to Underperform, citing slowed growth as a concern; Moffett Nathanson downgraded TTD's stock from Sell to Hold; and Wedbush and Citi to Neutral from Outperform and Buy, respectively. Oppenheimer highlighted TTD's "slower pace of next-gen adtech adoption," and Jefferies emphasized that "the rollout of the company's new Kokai platform has been slower than expected."

138. TTD's stock continued to crumble upon this news, falling from $88.33 at 4 PM on August 7, 2025, to $54.23 at 4 PM on August 8—a nearly 40% drop in just 24 hours.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

139. At all relevant times, the Individual Defendants made and/or permitted a series of false and misleading statements and omissions. Among other things, the Individual Defendants touted to investors that Kokai had supposedly been enthusiastically adopted by its client base and was driving revenue for the Company by providing clients with improved performance and functionality, rich first-party data integration and seeding capabilities, and a simple, intuitive interface. In truth, the Individual Defendants knew that TTD's clients were not adopting Kokai and that Kokai was not the much-touted revenue driver that the Individual Defendants claimed because it suffered from multiple fundamental defects. Kokai's issues were so severe they led to the Company's first-ever revenue miss since going public. Even today, TTD still cannot deprecate Solimar because Kokai's features are still being developed and the long-promised full adoption of Kokai has not occurred.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

140. On November 15, 2023, Defendant Schenkein spoke at a RBC Capital Markets Conference, during which she stated that "we'll expect that over the course of 2024, we get to full adoption" of Kokai.

141. The statement identified above was false and misleading, and omitted material facts regarding Kokai's adoption by clients. Once the Individual Defendants chose to tout Kokai's adoption, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, publicly reported adoption numbers were inflated, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were impossible to conduct and took longer to perform. Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

142. On February 15, 2024, TTD filed a Form 10-K that included the Company's earnings results for the year ending December 31, 2023. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

143. During the scripted portion of Defendant Green's remarks during the earnings call, he stated that "We have never launched a product with this much change, and we've never launched a product with this much confidence that what we have represents a major advance in advertiser performance and that it is going to be

- 39 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

enthusiastically adopted." He further stated that "2024 stands to be a major year for political spending here in the United States."

144. The statements identified above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout Kokai's adoption and performance, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, publicly reported adoption numbers were inflated, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

145. The statements identified above were also false and misleading, and omitted material facts, because Kokai did not provide a "major advance in advertiser performance." Rather, Kokai suffered from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

146. During the scripted portion of his remarks on the earnings call, Defendant Green further stated that:

> Kokai represents a completely new way to understand and score the relevance of every ad impression, across all channels. It allows advertisers to use an audience-first approach to their campaigns, targeting their audiences wherever they are on the open Internet.

147. The statements identified above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout Kokai's performance and capabilities, they were obligated (but failed) to disclose that Kokai was suffering from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features – including its Relevance metric – did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be.

148. On May 8, 2024, TTD filed a Form 8-K that included the Company's earnings results for the quarter ending March 31, 2024. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke, and issued a press release which included a quote attributed to Defendant Green.

149. During the scripted portion of Defendant Green's remarks during the earnings call, he stated:

> I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we're delivering to our clients with Kokai.

- 41 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***

[T]he open internet is getting replumbed and revalued, especially in contrast to the value offered by walled gardens. And the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising TAM.

150. During the scripted portion of Defendant Schenkein's remarks during the earnings call, she stated:

All of our progress in areas such as CTV, retail media, Kokai, and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024.

***

In closing, we are encouraged about the momentum of our business. We're executing on large long-term growth drivers, including . . . Kokai . . . .

151. TTD's press release accompanying the Company's Form 8-K also included a quote by Defendant Green, in which he stated that: "[W]ith significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share."

152. The statements identified above were false and misleading, and omitted material facts, because they conveyed that Kokai was driving and would continue to drive revenue growth for the Company. Once the Individual Defendants chose to speak about Kokai's ability to drive revenue for the Company and performance, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the

- 42 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

platform were difficult to conduct and took longer to perform. Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

153.   On the earnings call, Defendant Green also touted that Kokai enjoyed a suite of cutting-edge tools—including "relevant scoring, forecasting, budget optimization, frequency management, or upgraded measurement"—which were "bringing the power of AI to a broader range of key decision points than ever . . . ."

154.   The statement identified above was false and misleading, and omitted material facts because it conveyed to investors that Kokai included critical and properly developed advertising tools, including "relevant scoring, forecasting, budget optimization, frequency management, or upgraded measurement." Once the Individual Defendants chose to tout Kokai's capabilities and performance, they were obligated (but failed) to disclose the truth. In reality, there were significant defects with the platform—including that a number of Kokai's key performance metrics and features, including the Relevance metric, did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted

- 43 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

it to be and forcing TTD to continue the costly undertaking of operating two platforms.

155. On May 17, 2024, Defendant Jacobson appeared for a panel discussion on "Management" at the DMS by Luma Conference. During that discussion, Defendant Jacobson touted Kokai's new "Sellers and Publishers 500+" list, a list which TTD claimed provided advertisers a list of the 500 best publishers with whom to place ads: "[W]e talked about Kokai, which is the upgrade of our platform and one of the components there is something we call the Sellers and Publishers 500+, and that's pulling together the best access of inventory across the open internet to make it easy for advertisers to buy in a brand-suitable way that still transparently delivers performance."

156. The statement identified above was false and misleading, and omitted material facts because it conveyed to investors that Kokai included critical and properly developed advertising tools, including a "Sellers and Publishers 500+" list which "pull[ed] together the best access of inventory across the open internet." In reality, the Sellers and Publishers 500 feature did not improve performance, deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

157. During the same appearance, Defendant Jacobson stated "We . . . recognize the value of machine learning or AI, which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear."

158. The statement identified above was false and misleading, and omitted material facts because it conveyed to investors that Kokai was able to integrate first-

- 44 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

party data effectively. Once the Individual Defendants chose to tout Kokai's data integration capabilities, they were obligated (but failed) to disclose the adverse facts about firstparty data integration, including that clients in key industries, including healthcare and politics, were unable to integrate their data to seed the platform, deterring clients from increasing their spending on the platform and preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

159.   On June 3, 2024, TTD published a video on its YouTube channel titled "Sellers and Publishers 500+."  In the video, TTD stated:

> What if there was a solution that enables advertisers to maintain control over inventory quality while also reaching their desired audiences at scale? Well, there is. The Sellers and Publishers 500+. The Sellers and Publishers 500+ is an inventory buying option that is centered on transparency and decisioning. Comprised of high quality inventory from the top 500 plus inventory properties across the open internet. The Sellers and Publishers 500+ eliminates unnecessary complexity and fragmentation while enforcing the highest inventory standards it's never been easier to have . . . . A few attributes of the Sellers and Publishers 500+ list include: One, quality. Each seller and publisher is included on the list because it has a proven track record of quality inventory that delivers performance for advertisers. Quality is evaluated based on metrics such as viewability, supply paths and page level experiences which includes ad load and refresh rates. . . . The Sellers and Publishers 500 Plus is a transparent solution that helps advertisers focus on their audiences' ad experience and to confidently apply decisioning and optimization to their campaigns to reach their audience across the open internet.

160.   The statements identified above were false and misleading, and omitted material facts because they conveyed to investors that Kokai included critical and properly developed advertising tools, including a "Sellers and Publishers 500+" list "that helps advertisers focus on their audiences' ad experience and to confidently apply decisioning and optimization to their campaigns to reach their audience across the open internet." In reality, the Sellers and Publishers 500 feature did not improve

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

performance, deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be.

161.   On June 25, 2024, TTD published a video on its YouTube channel titled "Key Kokai Concepts – First-party data | From Trading Essentials: Kokai." In the video, Defendant Green stated the following regarding first-party data integration on Kokai:

> One of the things that's important to talk about for just a minute is the importance and significance of first-party data. One of the things that we've maintained—this has actually been a belief of The Trade Desk since before we'd written a single line of code—was that an advertiser's first party data is more valuable to them than anyone else's data. . . .

> One of the things that I'm most excited about in Kokai is that we fuse together a product we started shipping before Kokai, which is called Galileo. . . . Galileo is the way for you to onboard first-party data, and our goal was to make that as easy as possible. . . . And throughout the platform you'll see relevance score, which is essentially saying let's take that seed or that first-party data that you've onboarded using Galileo, and let's compare that to the general audiences or the audiences that you're covering. So if a particular ad group has a relevant score of 25x, it means based on the source of truth, your seed, we think the people that you're targeting are roughly 25 times more likely to convert than the general population. That is only made possible by you leveraging your first-party data, so in order to get the best out of Kokai you have to be leveraging your first-party data on the platform.

162.   The statements above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout Kokai's performance and capabilities, including the ability to integrate first-party data, they were obligated (but failed) to disclose the adverse facts about the platform. In reality, Kokai was suffering from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

163. On June 28, 2024, TTD issued a press release in which it stated:

Traders tout how Kokai is driving campaign success. . . . Already, Kokai—The Trade Desk's new UI [user interface]—has yielded notable campaign results, as told by the traders who have been using our new tools.

***

Overall, campaigns in Kokai Beta saw improved KPI performance, with notable optimizations across the board. This includes a 24% drop in cost per unique reach, 36% lower cost per click (CPC), and a 34% reduction in cost per action (CPA), on average. While it's clear our platform is driving results against a set of full-funnel KPIs, there are several key differentiators driving trader adoption, confidence, and success on the platform.

***

There are various inputs that enable the platform AI to assess media impressions. One such input is relevance, a score that is derived from seed data — or data from your most ideal audience. Kokai can now use information about your ideal customer to assess every single impression, and then buy against those impressions based on value. Breeze is already seeing incredible results for the campaigns she manages.

***

For media buyers, optionality is important, but too much decision-making in terms of campaign setup and delivery can be paralyzing. Decision overload is quelled by the platform, with AI serving as your co-pilot as you make selections. The new UI [user interface] offers a curated and simplified list of options, which means you can spend your time wisely, making smarter choices instead of being bogged down by endless decisions. Relevance is our secret to helping you simplify things enough to make those choices on the platform.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

164. The statements identified above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout Kokai's performance and capabilities, they were obligated (but failed) to disclose the adverse facts about the platform, including that a number of Kokai's key performance metrics and features, including the Relevance metric, did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

165. On August 8, 2024, TTD filed a Form 10-Q that included the Company's earnings results for the quarter ending June 30, 2024, and a Form 8-K therewith, containing a press release. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

166. The press release accompanying the Form 8-K included quotes from Defendant Green, which stated:

> As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

167. During the scripted portion of Defendant Green's remarks during the earnings call, he stated:

> Kokai allows our clients to deploy data about their most loyal customers, and then use that data as a seed to grow and harvest the next generation of loyal customers. Kokai helps them target those new audiences across the many thousands of destinations that comprise the best of the open Internet . . . .

> ***

> For those campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%. Cost-per-acquisition has improved by about 27% as data elements per impression have gone up by about 30%. In addition, performance metrics have improved by about 25% helping to unlock performance budgets on our platform for years to come. So our clients are getting more precise, more cost efficient, and then they're able to reinvest for even more reach and drive a much better return on ad spend.

168. Defendant Green further stated that he was "incredibly encouraged by the early results from Kokai," stating unequivocally that the Company had "met the moment with Kokai" and Kokai was "firing on all cylinders . . . ."

169. The statements identified above were false and misleading, and omitted material facts because they conveyed to investors that Kokai clients were: (1) able to "deploy" their data and "seed" the platform in order to grow customers and produce better performing ad campaigns; and (2) experiencing significant performance improvements including in the areas of "incremental reach," "cost-per-acquisition," and "data elements per impressions" when, in reality, many Kokai clients—including TTD's largest and most lucrative clients—were unable to integrate their data to seed the platform and Kokai was not improving client performance. Once the Individual Defendants chose to tout Kokai's capabilities and performance metrics, they were obligated (but failed) to disclose the adverse facts about the platform, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

170. The second statement above is false for two additional reasons. First, internally, incremental reach was always discussed and measured on a campaign-by-campaign basis. Accordingly, Defendant Green had no accurate basis for touting Kokai's incremental reach in the aggregate—*i.e.*, over multiple campaigns, like Defendant Green purported to do during the second quarter 2024 earnings call—given the different combinations of settings and different levels of aggressive pricing. Second, Defendant Green was inaccurately attributing to Kokai a reduction in cost that are due to other things, like seasonality (*i.e.*, the time of year when the ad campaigns were being run), creatives (*i.e.*, the quality of the ads themselves), audience, or what the opposition trader did during an ad buy.

171. On November 7, 2024, TTD filed a Form 10-Q that included the Company's earnings results for the quarter ending September 30, 2024. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke, and TTD filed a Form 8-K containing a press release which included a quote attributed to Defendant Green.

172. TTD's press release accompanying its Form 8-K included quotes attributed to Defendant Green stating that:

> We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail

- 50 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

data marketplace. And the performance improvements that our clients are seeing with Kokai — our largest platform upgrade to date — showcase the value of audience-driven, AI-enabled innovation.

173. During the scripted portion of his remarks on the earnings call, Defendant Green stated:

Key investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond.

174. Defendant Green also noted that Kokai was "encouraging CMOs and CFOs to lean more and more on TTD to deliver real, measured growth," and the Company was "already seeing the results of Kokai performance today . . . ." Defendant Green further stated Kokai's innovations were "helping advertisers identify and target new potential customers with much greater precision" and "[d]ata elements per impression continue to increase," which was "significantly" improving performance.

175. Defendant Green also noted that TTD was "currently firing on all cylinders" with respect to Kokai, calling the efforts with respect to the new platform "amazing."

176. In response to analyst questions, Defendant Green stated that "[t]he adoption [of Kokai] has been phenomenal. The product is the best that we've ever shipped."

177. The statements identified above were false and misleading, and omitted material facts, because they conveyed that clients were quickly and enthusiastically adopting Kokai and that Kokai clients were experiencing significant performance improvements. Once the Individual Defendants chose to speak about adoption of Kokai and its performance, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's

- 51 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

performance—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

178. As publicly reported in several analyst reports, Defendant Green and TTD made additional representations on or around November 7, 2024, as part of "analyst call backs," regarding both current and anticipated Kokai adoption numbers, including:

> [A]d campaigns run on Kokai were at about 50% penetration of clients during 3Q24.

> ***

> ~50% of all TTD customers have now adopted Kokai, which has driven a 30% uptick in data usage alongside a 25-30% downtick in CPC/CPA.

> ***

> Kokai to be fully adopted by end of 2025 (currently nearing 50%).

> ***

> [Management] remain[ed] confident that [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025, while inching towards 50% adoption currently.

> ***

> Clients continue to adopt Kokai, and the percentage of spend through Kokai is approaching 50% and is on pace to reach 90% by the end of next year. . . . We expect the transition will attract incremental spending

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

over time as Kokai adoption trends towards management's goal of 90% by the end of 2025.

\*\*\*

Mgmt. remains confident that it [Kokai] will achieve a 100% rollout for all advertisers by the end of 2025 (that is, 100% of advertisers' spend via Kokai), while inching towards 50% adoption currently.

179.   The statements identified above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout the purported client adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance— including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms. February 12, 2025—2024 Fourth Quarter Results.

180.   On February 12, 2025, TTD filed a Form 8-K that included the Company's earnings results for the quarter ending December 31, 2024. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

181.   In the scripted portion of his remarks on the earnings call, Defendant Green stated that TTD would: "[M]ove 100% of our clients to Kokai this year. Now the majority already have."

- 53 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

182.    The statement identified above was false and misleading, and omitted material facts. Once the Individual Defendants chose to tout adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms. Indeed, even today Kokai has not been fully adopted.

183.    During the earnings call, Defendant Green further stated that:

> Kokai is more effective in almost every way. We are producing case study after case study as clients continue to lean into the features of our Kokai platform, every one of them showing the enhancements and effectiveness that goes up with the use of Kokai.

184.    The statements identified above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout Kokai's client experience, they were obligated (but failed) to disclose that clients routinely reported that Kokai did not perform well and was unable to provide critical services, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not

- 54 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

185. On May 8, 2025, TTD filed a Form 10-K that included the Company's earnings results for the quarter ending March 31, 2025. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

186. In the scripted portion of his remarks on the earnings call, Defendant Green stated:

> The core of Kokai has been delivered, and adoption is now ahead of schedule. Around two-thirds of our clients are now using it and the bulk of the spend in our platform is now running through Kokai. We expect all clients to be using it by the end of year. . . .
>
> We are also working with clients beyond typical brand and reach metrics. Kokai is delivering on lower funnel KPIs, including 24% lower cost per conversion and 20% lower cost per acquisition. These improvements are helping unlock performance budgets from new and existing clients. And thanks to the work we've done in our data marketplace to increase the discoverability of third-party data, campaigns on Kokai use roughly 30% more data elements per impression. All of these efficiencies mean more dollars can be reinvested and put to work.

187. In the scripted portion of her response, Defendant Schenkein added that "[i]t was such a strong quarter for us. And I would attribute the strength to the uptake in Kokai adoption . . . ."

188. In response to an analyst question, Defendant Green further represented that:

- 55 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As a result of these investments in AI and upgrading our platform altogether in Kokai, campaign performance on Kokai continues to be exceptional. Kokai is delivering on lower funnel KPIs, including 24% lower cost per conversion and 20% lower cost per acquisition, and these improvements are helping unlock performance and performance budgets from existing clients, but also from new clients that are a bit more focused on the performance side of things.

189.   The statements in above were false and misleading, and omitted material facts. Once the Individual Defendants chose to tout adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that the Individual Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

## INSIDER TRADING

190.   At the same time the Individual Defendants touted Kokai to investors, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson unloaded over $465 million of their stock. These stock sales were highly unusual and suspicious, including (i) when measured by the total amount of shares sold; (ii) in contrast with their prior trading history; (iii) the timing of the sales relative to key false and misleading statements and omissions and corrective disclosures; and (iv) the avoidance of substantial losses.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

191. As a result of these sales, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson profited from the artificial inflation in the price of Trade Desk's stock due to the false and misleading statements and omissions. These sales occurred before the revelation of Kokai's lagging adoption and fundamental deficiencies and the attendant drag on TTD's revenue, and thus before Trade Desk's stock price substantially declined in response to those revelations.

192. Specifically, while the Company's stock price was artificially inflated, Defendant Green sold approximately 4,081,128 shares of his TTD stock for proceeds of more than $443 million.

193. While the Company's stock price was artificially inflated, Defendant Schenkein sold approximately 169,840 shares of Trade Desk common stock, totaling proceeds of more than $18 million.

194. While the Company's stock price was artificially inflated, Defendant Rajaram sold approximately 6,480 shares of Trade Desk common stock, totaling proceeds of approximately $677,204.10.

195. While the Company's stock price was artificially inflated, Defendant Cunningham sold approximately 1,606 shares of Trade Desk common stock, totaling proceeds of approximately $160,712.42.

196. While the Company's stock price was artificially inflated, Defendant Jacobson sold approximately 71,697 shares of Trade Desk common stock, totaling proceeds of more than $7 million.

197. The Officer Defendants' outsized stock sales were also suspiciously timed. They each sold a vast number of shares at artificially inflated prices after they learned materially adverse information, but before that information was disclosed to the public. In fact, the Officer Defendants' stock sales were on the very same day as or immediately following their false and misleading statements and omissions

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regarding Kokai that served to artificially inflate TTD's stock price.

198. For example, on November 15, 2023—just two days after Defendant Green amended his 10b5-1 plan—the Individual Defendants falsely and misleadingly assured investors that, "we'll expect that over the course of 2024, we get to full adoption" of Kokai. Then just two days later, Defendant Schenkein sold 2,613 of her shares for $173,712 in proceeds.

199. Similarly, on February 16, 2024, just one day after the Individual Defendants falsely and misleadingly told the market that they had never been more confident that Kokai was being "enthusiastically adopted," Defendant Schenkein sold 3,391 of her shares for proceeds of $303,596. A week later, between February 21 and 23, 2024, Defendant Green sold 225,000 of his shares for proceeds of $18.60 million.

200. Once again, on August 8, 2024, the Individual Defendants issued additional false and misleading statements, including that they were "incredibly encouraged by the early results from Kokai," stating unequivocally that the Company had "met the moment with Kokai" and Kokai was "firing on all cylinders . . . ." Just two trading days later, on August 12, 2024, Defendant Jacobson sold 21,162 of her shares for over $2 million in proceeds, on August 16, 2024, Defendant Schenkein sold 3,130 of her shares for $310,903 in proceeds; and between August 22–26, 2024, Defendant Green sold 419,351 of his shares for proceeds of over $43.5 million.

201. Then, on November 7, 2024, the Individual Defendants falsely and misleadingly told the market that "[t]he adoption [of Kokai] has been phenomenal. The product is the best that we've ever shipped." That same day, Defendant Schenkein sold another 27,687 of her shares for over $3.5 million.

202. Further, the Individual Defendants also sold hundreds of thousands of their personal shares immediately preceding the truth coming to light, which caused the Company's stock price to plummet. Most notably, Defendant Green sold 400,000

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shares—for a total of $48,271,897—just one day before the February 12, 2025, disclosure that Kokai's slow adoption caused TTD's first revenue miss ever, which caused the Company's stock price to fall from $122.23 to $81.92, or 33%—then the largest single-day stock drop in the Company's history.

## SHARE REPURCHASES

203. According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 978,000 shares of its own stock, for a total expenditure of approximately $110,491,950 million.

204. Given that the price of Trade Desk stock was $81.92 per share on February 13, 2025, after the corrective disclosures, the true value of the 978,000 repurchased shares was roughly $80,117,760. Accordingly, the Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase these shares.

## DAMAGE TO THE COMPANY

### Securities Class Action

205. On February 19, 2026, a securities class action complaint was filed in the United States District Court for the Central District of California against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *In re Trade Desk, Inc. Securities Litigation, et al.*, Case No. 2:25-cv-01396-CAS-DFM (C.D. Cal.) ("Securities Class Action").

206. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

sums in relation to the Securities Class Action and any liability or settlement that results.

## Insider Trading

207.   As alleged above, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson took advantage of their material, non-public information regarding Kokai by selling their personally held TTD stock at artificially inflated prices. As a result of their illicit sales, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson obtained millions of dollars in proceeds which is subject to disgorgement.

## Share Repurchases

208.   As alleged above, the Individual Defendants caused and/or permitted the Company to engage in harmful share repurchases, resulting in the Company overpaying for its own common stock by more than $30 million.

## Executive Departures

209.   As discussed above, following the revelation of the wrongdoing, Defendant Schenkein, then-CFO, abruptly left the Company.

210.   Defendant Schenkein held a high-ranking executive role within the Company, and filling that role necessarily required the Company to expend significant amounts. As is commonly reported, the cost of replacing C-suite executives can be costly for a company.[3]   Thus, the Company having to replace Defendant Schenkein as a result of their wrongful conduct will undoubtedly have cost the Company substantial amounts.

---

[3]   *See e.g.*, *The Quiet (and Expensive) Cost of Poor C-Suite Retention*, Stanton Chase (Aug. 2022), https://www.stantonchase.com/insights/white-papers/the-quiet-and-expensive-cost-of-poor-c-suite-retention-2; *CEO Selection: The Costs of Getting it Wrong*, Spencer Stuart (May 2016), https://www.spencerstuart.com/research-and-insight/ceo-selection---the-costs-of-getting-it-wrong; *How Much Does Replacing an Employee Cost?*, BOS (2019), https://www.bos.com/inspired/how-much-does-replacing-an-employee-cost/.

- 60 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Unjust Compensation**

211.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

212.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

213.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

214.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

215.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

216.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

217. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

218. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

219. At all relevant times, the Company had in place its Code of Conduct which applies to the Company's "directors, officers and employees."

220. In a section entitled "Disclosures," the Code of Conduct states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

221. In a section entitled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

- 62 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

222.   In a section entitled "Reporting, Accountability and Enforcement," the Code of Conduct provides:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to their supervisor, or directly to the Company's Chief Financial Officer or General Counsel. . . .

223.   The Individual Defendants failed to adhere to the Code of Conduct when they issued false and misleading statements and engaged in the wrongdoing described herein. Additionally, the Individual Defendant's failure to maintain the accuracy of Company records and reports, along with their failure to report other mismanagement, violates the Code of Conduct's sections regarding ethical obligations, confidentiality, and company assets.

**Audit Committee Charter**

224.   At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter provides that the role of the Committee is to: "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

- 63 -

225.   The Audit Committee Charter also sets out the following specific duties and responsibilities, in relevant part:

*Annual Financial Statements and Annual Audit*

3. *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7. *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. 8. *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

9. *Complaint Procedures*. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

10. *Reports to the Board of Directors*. The Committee must report regularly to the Board regarding the activities of the Committee.

11. *Committee Self-Evaluation*. The Committee must periodically perform an evaluation of the performance of the Committee.

12. *Review of this Charter*. The Committee must annually review and reassess this Charter and submit any recommended changes to the Board

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for its consideration.

13. *Review of Related Person Transactions*. The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved by the Committee.

14. *Review of Code of Ethics*. The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Conduct and Ethics and the procedures in place to enforce the Code of Conduct and Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Conduct and Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

226. The Audit Committee failed to uphold their duties required by the Audit Committee Charter by failing to conduct oversight of the Company's engagement in the Individual Defendant's issuing false and misleading statements to the public. Furthermore, the Audit Committee violated the Audit Committee Charter by failing to maintain the accuracy of Company reports and records, failing to comply with laws and regulations, and failing to properly report violations to the rest of the Audit Committee.

**DUTIES OF THE DIRECTOR DEFENDANTS**

227. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

228. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

229. By reason of their positions as officers and/or directors of the Company,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were, and are, required to act in furtherance of the best interests of the Company and its investors.

230. Each Director Defendant owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

231. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value

- 66 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

232.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

233.    The Director Defendants breached their duties of loyalty and good faith

- 67 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

234.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

235.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

236.   Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

237.   Following the alleged misconduct and damage, on June 19, 2025, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as **Exhibit A** is a true and correct copy of the Demand.

238.   Following this, on August 4, 2025, the Board, through counsel, wrote to Plaintiff to inform him of its decision to "defer action on the Litigation Demands until the underlying Class Action further progresses." Attached hereto as **Exhibit B** is a

- 68 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

true and correct copy of the Board's response.

239. Promptly thereafter, noting the lack of justification for the deferral, Plaintiff wrote to the Board to dispute its decision and insist that the Board undertake its investigation. Following back-and-forth correspondence, Plaintiff agreed to the deferral of the Demand pending the resolution of the motion to dismiss in the Securities Class Action in exchange for, *inter alia*, tolling agreements. That agreement was executed on September 29, 2025.

240. Following the denial of the motion to dismiss in the Securities Class Action and the automatic termination of the deferral, Plaintiff wrote to the Board on April 21, 2026 to note the termination of the deferral and insist that the Board commence its investigation. Attached as **Exhibit C** hereto is a true and correct copy of Plaintiff's letter.

241. On May 8, 2026, the Board wrote to Plaintiff to inform him of its decision to, once again, defer its consideration of the Demand "pending resolution of the Securities Litigation." Attached as **Exhibit D** hereto is a true and correct copy of the Board's response.

242. This indefinite and continued deferral is improper for several reasons, thus constituting a *de facto* refusal of the Demand.

243. The Board's decision to defer the Demand for an undetermined amount of time is equivalent to an indefinite deferral which courts find requires a stronger justification than a brief deferral. However, this stronger justification is not present in the Board's response. Instead, the Board has merely recited, in conclusory fashion, boilerplate factors forming the basis of its decision to defer the Demand. Yet, even if the Board explained how and why these factors were relevant to its decision to defer, none of the factors serve as sufficient justification to defer in any event.

244. The Board has been on notice of the wrongdoing alleged herein since at

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

least the commencement of the Securities Class Action, filed in February 2026, if not from the beginning of the wrongdoing alleged herein. As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk, which the Board have been further made aware of as a result of the denial of the motion to dismiss in the Securities Class Action.  However, to date, the Board has failed to take any action on behalf of the Company.

245. Because the Individual Defendants plausibly knew about the wrongdoing, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as it moves forward with defective internal controls and burdened with the financial harms caused to it.

246.  In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.[4]

247.  Moreover, this lengthy delay in taking any action carries the risk that as time progresses, evidence becomes stale, memories dim, and the ability to adequately investigate and/or prove the allegations herein will become more burdensome, particularly given the risks of potential destruction of documents and electronic data

---

[4]    It is also plausible that the Board, aware that (i) other related actions asserting demand futility may be dismissed for failing to make a demand, and (ii) the statute of limitations period could expire, are ignoring Plaintiff's demand so they will not have to investigate and commence an action against themselves for the alleged wrongdoing. Such action would most certainly not be in the Company's best interests, nor would it constitute a good faith exercise of the Board's business judgment.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(whether intentional or inadvertent), dissipation of the Company's assets, fading memories, and increased geographical dispersion of percipient witnesses. Thus, the Board's lengthy and continued inaction here does not serve the interests of the Company in being able to adequately investigate and/or bring the claims that belong to it.

248. Further, to the extent the Board is waiting for developments in related litigation, courts have long held that if the mere existence of pending lawsuits were enough to outweigh all other factors, a company's rights of action against errant officers and directors would be seriously compromised. Accordingly, a deferral based on the Securities Class Action, or other pending litigation, is not justified.

249. Accordingly, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in the Company's favor and should be permitted to proceed with this derivative action.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

250. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

251. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

252. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

253. The Individual Defendants engaged in a sustained and systematic failure

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

254.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

255.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

256.   Furthermore, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson breached their fiduciary duties to the Company through their illicit sales of TTD stock while in possession of material, non-public information.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

257.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

258.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

259.   As a direct and proximate result of the Individual Defendants' gross

- 72 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

260. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

261. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

262. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

263. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

264. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

265. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

- 73 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

267. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

268. Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for

### Violations of Section 10(b) of the Exchange Act)

269. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

270. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Trade Desk. Not only is Trade Desk now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Trade Desk by the Individual Defendants.

271. The Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase roughly 978,000 shares.

272. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to

- 74 -

falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

273.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trade Desk not misleading.

274.   The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Trade Desk.

275.   The Individual Defendants acted with scienter in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

276.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

- 75 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.     Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors.

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 15, 2026

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

- 76 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Email: lrosen@rosenlegal.com

*Local Counsel for Plaintiff*

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com

*Counsel for Plaintiff*

- 77 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, JOSEPH FERNICOLA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of The Trade Desk, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of The Trade Desk, Inc. common stock at all relevant times.

Joseph Fernicola
_____
JOSEPH FERNICOLA

1

# EXHIBIT A

# GAINEY McKENNA & EGLESTON

---

**ATTORNEYS AT LAW**

260 MADISON AVENUE
22nd FLOOR
NEW YORK, NEW YORK 10016
TEL: (212) 983-1300
FAX: (212) 983-0383

www.gme-law.com

375 ABBOTT ROAD
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

June 19, 2025

**<u>Via FedEx</u>**

Mr. Jeff T. Green
Chief Executive Officer and Director
The Trade Desk, Inc.
42 N. Chestnut Street
Ventura, CA 93001

   Re: <u>Shareholder Litigation Demand</u>

Dear Mr. Green:

   We represent Mr. Joseph F. Fernicola, a beneficial owner of Trade Desk, Inc. ("Trade Desk" or the "Company") common stock.

   Mr. Fernicola intends to retain his ownership interest through the conclusion of any further proceedings relating to the contents of this letter.   This letter constitutes a formal demand on behalf of our client that the Board of Directors (the "Board") of Trade Desk take action against certain current and/or former officers and directors of the Company, including Laura Schenkein, Lisa J. Buyer, Andrea L. Cunningham, Kathryn E. Falberg, Gokul Rajaram, David B. Wells, Samantha Jacobsen, yourself, and other individuals (the "Officers and Directors") and entities that engaged in the wrongdoing as set forth below.

   This litigation demand is related to, among other things, the false and/or misleading statements and/or failure to disclose that: (1) the Company was experiencing self-inflicted execution challenges in rolling out Kokai, including transitioning clients from the Company's older platform and struggling to understand customer needs; (2) that the Company had "in some cases" deliberately slowed the release of Kokai; (3) that, as a result of the foregoing, the Company's

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 2*

rollout of Kokai was meaningfully delayed; (4) that Trade Desk's inability to effectively execute the rollout of Kokai negatively impacted the Company's revenue growth; and (5) that, as a result of the foregoing, the positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

Mr. Fernicola hereby demands that the Board take action against the above-named Officers and Directors for their breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, insider trading, aiding and abetting, and other unlawful conduct. The Board should also consider and implement corporate governance reforms designed to address and prevent the sort of wrongdoing described in this letter.

## BACKGROUND

As you are aware, Trade Desk is a technology company that operates a self-service, cloud-based platform targeted at advertisers. The Company's platform integrates with inventory, publisher, and data partners to provide ad buyers with the ability to create, manage and optimize data-driven digital advertising campaigns across ad formats and channels.

On June 6, 2023, the Company launched Kokai, a new digital advertising platform experience which purported to incorporate major advances in distributed artificial intelligence (AI), measurements, and advertising partner integrations. In the press release announcing the launch, Trade Desk described Kokai as a "co-pilot to the programmatic marketer" that digests over 13 million advertising impressions every second, helping "advertisers buy the right ad impressions, at the right price, to reach the target audience at the best time." The Company advertised Kokai as its "largest and most important platform overhaul ever."

## FALSE AND MISLEADING STATEMENTS

After the market closed on May 8, 2024, the Company issued a press release announcing its financial results for the quarter ended March 31, 2024. The press release reported the Company's financial results and touted the Company's "greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform." Specifically, the press release stated in relevant part:

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 3*

"Q1 was a strong quarter for The Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year. Our outstanding performance to start the year underlines the value advertisers are placing on premium inventory on the open internet," said Jeff Green, Co-founder and CEO of The Trade Desk. "With the continued strong growth of CTV, the growing ubiquity of UID2, new approaches to authentication, ***greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share***."

First Quarter 2024 Financial Highlights:

The following table summarizes our consolidated financial results for the three months ended March 31, 2024 and 2023 ($ in millions, except per share amounts):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2024 | 2023 |
| **GAAP Results** | | |
| Revenue | $ 491 | $ 383 |
| Increase in revenue year over year | 28 % | 21 % |
| Net income | $ 32 | $ 9 |
| GAAP diluted earnings per share | $ 0.06 | $ 0.02 |
| **Non-GAAP Results** | | |
| Adjusted EBITDA | $ 162 | $ 109 |
| Adjusted EBITDA margin | 33 % | 28 % |
| Non-GAAP net income | $ 131 | $ 114 |
| Non-GAAP diluted earnings per share | $ 0.26 | $ 0.23 |

During the related earnings call held on May 8, 2024 (the "1Q24 Earnings Call"), you touted the success of the Kokai rollout, stating, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai." You further highlighted how Kokai will allow its users to capitalize on advertising opportunities beyond the technology conglomerates, such as Facebook, Instagram, and Google, *i.e.*, the "open Internet," stating the following, in relevant part:

And the innovations in our Kokai platform will help our clients take

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 4*

advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising [total addressable market].

Later on the 1Q24 Earnings Call, Schenkein reiterated the role of Kokai in propelling the Company's growth, stating, "All of our progress in areas such as CTV, Retail Media, Kokai and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024.'

On June 28, 2024, the Company issued a press release entitled "***Traders tout how Kokai is driving campaign success***," which advertised the purported popularity of Kokai amongst users and the unqualified success of its rollout. The press release stated the following, in relevant part:

> ***Traders tout how Kokai is driving campaign success***
>
> E*xactly one year since The Trade Desk announced its vision for Kokai*, the demand-side platform welcomed clients and partners to its New York City office to share more about its latest — and ***most transformative — platform update***, made available to clients in early June.
>
> While over the last year the ad world voiced shared concerns around made-for-advertising websites, the value of user-generated content, and how to save journalism on the open internet (among other important topics), The Trade Desk was building and shipping new innovations aimed at making the industry stronger and the internet a better, easier place to buy media. ***Already, Kokai — The Trade Desk's new UI — has yielded notable campaign results, as told by the traders who have been using our new tools.***
>
> Overall, campaigns in Kokai Beta saw improved KPI performance, with notable optimizations across the board. This includes a 24% drop in cost per unique reach, 36% lower cost per click (CPC), and a 34% reduction in cost per action (CPA), on average. While it's clear our

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 5*

platform is driving results against a set of full-funnel KPIs, there are several key differentiators driving trader adoption, confidence, and success on the platform.

On August 8, 2024, the Company issued a press release announcing its financial results for the quarter ended June 30, 2024. The press release reported the Company's financial results and touted the progress of "Kokai['s] ramp" and "ongoing innovations in Kokai." Specifically the press release stated in relevant part:

"Q2 was another strong quarter for The Trade Desk, with revenue of $585 million, representing 26% year-over-year growth," said Jeff Green, Co-founder and CEO of The Trade Desk. "We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. ***As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.***"

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2024 | 2023 | 2024 | 2023 |
| **GAAP Results** | | | | |
| Revenue | $ 585 | $ 464 | $ 1,076 | $ 847 |
| Increase in revenue year over year | 26 % | 23 % | 27 % | 22 % |
| Net income | $ 85 | $ 33 | $ 117 | $ 42 |
| GAAP diluted earnings per share | $ 0.17 | $ 0.07 | $ 0.23 | $ 0.08 |
| **Non-GAAP Results** | | | | |
| Adjusted EBITDA | $ 242 | $ 180 | $ 404 | $ 288 |
| Adjusted EBITDA margin | 41 % | 39 % | 38 % | 34 % |
| Non-GAAP net income | $ 197 | $ 139 | $ 328 | $ 254 |
| Non-GAAP diluted earnings per share | $ 0.39 | $ 0.28 | $ 0.66 | $ 0.51 |

During the related earnings call held on August 8, 2024, (the "2Q24 Earnings Call"), you touted Kokai's use case, stating as follows, in relevant part:

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 6*

In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, after years of development, we launched our most ambitious platform to date, Kokai. Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers.

Later during the 2Q24 Earnings Call, speaking regarding the Kokai rollout, you further proclaimed, he has "been incredibly encouraged by the early results from Kokai[,]" while highlighting that the "campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%[,]" and "[c]ost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%."   You further explained that "performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come."

Referencing his earlier remarks during the same 2Q24 Earnings Call about "meeting with many [chief marketing officers]" ("CMOs") from global brands who are "putting a premium on the efficacy of marketing," you stated, "Given everything I said about what CMOs today are trying to accomplish and the pressures that they are under, I firmly believe that we have met the moment with Kokai."

On November 7, 2024, the Company announced its third quarter 2024 financial results in a press release for the period ended September 30, 2024. The press release reported the Company's financial results and touted the Company's "***performance improvements that our clients are seeing with Kokai - our largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation***." The press release further offered finanical guidance, including "[r]evenue at least $756 million" in the fourth quarter of 2024. Specifically, the press release stated in relevant part:

"The Trade Desk delivered strong performance in the third quarter, with revenue of $628 million, accelerating growth to 27%. This performance underlines the value that advertisers are placing on precision and transparency as they work with us to maximize the impact of their campaigns," said Jeff Green, Co-founder and CEO of The Trade Desk. "As we enter our busiest time of year and look ahead to 2025, we have

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page  7*

never been in a better position to capture greater share of the $1 trillion advertising TAM. 2024 has been a banner year for CTV. Many of the largest media companies are now working with us to help clients capture the full value of CTV advertising via programmatic. We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail data marketplace. ***And the performance improvements that our clients are seeing with Kokai - our largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation***."

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| **GAAP Results** | | | | |
| Revenue | $ 628 | $ 493 | $ 1,704 | $ 1,340 |
| Increase in revenue year over year | 27 % | 25 % | 27 % | 23 % |
| Net income | $ 94 | $ 39 | $ 211 | $ 82 |
| Net income margin | 15 % | 8 % | 12 % | 6 % |
| GAAP diluted earnings per share | $ 0.19 | $ 0.08 | $ 0.42 | $ 0.16 |
| **Non-GAAP Results** | | | | |
| Adjusted EBITDA | $ 257 | $ 200 | $ 661 | $ 488 |
| Adjusted EBITDA margin | 41 % | 40 % | 39 % | 36 % |
| Non-GAAP net income | $ 207 | $ 167 | $ 536 | $ 421 |
| Non-GAAP diluted earnings per share | $ 0.41 | $ 0.33 | $ 1.07 | $ 0.84 |

\* \* \*

**<u>Financial Guidance</u>**:

Fourth Quarter 2024 outlook summary:

- ***Revenue at least $756 million***
- Adjusted EBITDA of approximately $363 million

During the related earnings call held on November 7, 2024, (the "3Q24 Earnings Call"), you once again assured investors that "[***w]e are already seeing the results of Kokai performance today, but we're just getting started***." Schenkein further touted that "[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only ***strengthening our foundation, but position us for durable growth in 2025 and beyond***."

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page  8*

Later, during the question-and-answer portion of the 3Q24 Earnings Call, an analyst asked you "[W]hat type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them?" The analyst added that it has "been a challenge in some other walled garden platforms" getting "people [to] trust[] the attribution data." In response, you stated, in relevant part:

> I really appreciate the question because I think this is one of the more nuanced ways that we have just so much opportunity in front of us. . . . But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years. And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple. But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total.

The statements identified above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Officers and Directors failed to disclose to investors: (1) that the Company was experiencing self-inflicted execution challenges in rolling out Kokai, including transitioning clients from the Company's older platform and struggling to understand customer needs; (2) that the Company had "in some cases" deliberately slowed the release of Kokai; (3) that, as a result of the foregoing, the Company's rollout of Kokai was meaningfully delayed; (4) that Trade Desk's inability to effectively execute the rollout of Kokai negatively impacted the Company's revenue growth; and (5) that, as a result of the foregoing, the positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

On February 12, 2025, after the market closed, Trade Desk released its fourth-quarter 2024 earnings, in a press release, revealing revenue of only $741 million. This significantly missed the Company's prior guidance of "at least" $756 million issued only months earlier. Specifically, the press release stated, in relevant part:

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 9*

### Fourth Quarter and Full Year 2024 Financial Highlights:

The following table summarizes the Company's unaudited consolidated financial results for the three and twelve months ended December 31, 2024 and 2023 ($ in millions, except per share amounts):

|  | Three Months Ended December 31, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
|  | 2024 | 2023 | 2024 | 2023 |
| **GAAP Results** | | | | |
| Revenue | $ 741 | $ 606 | $ 2,445 | $ 1,946 |
| Increase in revenue year over year | 22 % | 23 % | 26 % | 23 % |
| Net income | $ 182 | $ 97 | $ 393 | $ 179 |
| Net income margin | 25 % | 16 % | 16 % | 9 % |
| GAAP diluted earnings per share | $ 0.36 | $ 0.19 | $ 0.78 | $ 0.36 |
| **Non-GAAP Results** | | | | |
| Adjusted EBITDA | $ 350 | $ 284 | $ 1,011 | $ 772 |
| Adjusted EBITDA margin | 47 % | 47 % | 41 % | 40 % |
| Non-GAAP net income | $ 297 | $ 207 | $ 832 | $ 628 |
| Non-GAAP diluted earnings per share | $ 0.59 | $ 0.41 | $ 1.66 | $ 1.26 |

On the same date, the Company held an earnings call (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, you revealed that "Kokai rolled out slower than we anticipated," which was "in some cases" "deliberate," as the Company faced ongoing efforts to "understand what the customer needs." You disclosed that Trade Desk has yet to onboard all of its clients onto Kokai, stating, "[W]e'll move 100% of our clients to Kokai this year. Now the majority already have. ***But today, we're maintaining 2 systems, Solimar and Kokai. This slows us down. Kokai is more effective in almost every way.***" You further revealed Company had "a series of small execution missteps" and had underwent the "largest reorganization in company history" in part, to address these issues. Specifically, during the 4Q24 Earnings Call, you offered prepared remarks, including the following:

> Our brightest days are still ahead of us, but before I talk about that, I want to spend a few minutes sharing what we got wrong and the changes we are making to meet this moment and maximize our unique and growing opportunity. Starting off, let me explain it as I see it, what falling short of our own expectations does NOT represent. This didn't happen because the opportunity isn't as big as we thought. In this case, it isn't because of competition either. For Q4, the reality is that we

Mr. Jeff T. Green
Chief Executive Officer and Director
June 19, 2025
Page 10

stumbled due to a series of small execution missteps while simultaneously preparing for the future.

\* \* \*

In that effort, I want to highlight four major changes we've made at The Trade Desk in the last few months, and some related initiatives that accompany them. First, we did the largest reorganization in company history in December. While we often make structural changes at the end of the year to improve our business, this was bigger than usual.

Later during the 4Q24 Earnings Call you was asked by an analyst to provide "a little more detail about what you observed about the difference between you and the industry" given that "going into [the] earnings report, there were a lot of concerns" including potential "issues with Kokai rollout pace." In response, you stated the following:

The environment wasn't perfect, but we knew that when we guided even if it was slightly harder than we thought, we've navigated that before. So you are right. And I know there is going to be 1,000 questions, a bunch of you -- well, we actually started a couple of them, and I know there will be more because we've done so well for so long at setting expectations. And when we talk about the missteps specifically, many of them involve people, mistakes that aren't appropriate to discuss publicly, especially when people are already learning from these mistakes.

*One of those -- you're right, that Kokai rolled out slower than we anticipated. But much of that was for good reason. We've seen moments and places to inject AI like improving the foundation of our forecasting and performance models. That is a short-term negative for sure, but it is a long-term negative. We are working -- I'm sorry, it's a long-term positive, sorry. We are working really hard to get the deals right and lay groundwork to move the upfront to digital.*

Again, long term, I think this is amazingly good for us. And I'm confident we are building the right things. *In other words, in some*

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 11*

***cases, the slower Kokai rollout was deliberate, a quicker rollout would
result in more short-term spend, and we don't always build what the
customers want. Instead, we are trying to understand what the
customer needs.*** Elevating us and them together is a much harder task
than simply taking orders. So as it relates to the internal changes, I think
it is best to operate a company with our talent and the opportunity that
we're facing to build the org and the team of the future, as fast as
possible so that we capture the most market share possible at end state.

On this news, the Company's stock price fell $40.31, or 32.98%, to close at
$81.92 per share on February 13, 2025, on unusually heavy trading volume.

## ACTION DEMANDED

By virtue of their positions as directors and/or officers of the Company and
because of their ability and duty to control the business and corporate affairs of the
Company, the above-named Officers and Directors of Trade Desk owe the Company
and its shareholders the fiduciary duties of loyalty, due care, and candor.

As noted above, on behalf of Mr. Fernicola, we demand that full corrective
action be brought, including commencing a civil action against each responsible
individual and entity and each responsible affiliate of the Company, including each
of the above-named Officers and Directors, to recover for the benefit of the
Company, as described at the outset of this letter.   The Company must recover from
the aforementioned individuals the amount of damages sustained by the Company
as a result of their breaches of fiduciary duties and other wrongful conduct as
described herein.

The action that should be brought against the above-mentioned individuals
should seek a monetary recovery for damages that include, but are not limited to:

(a)     Damage to the Company's reputation and good will (including
irreparable damage to the Company's reputation and credibility);

(b)     Resultant loss of business and business opportunities;

*Mr. Jeff T. Green*
*Chief Executive Officer and Director*
*June 19, 2025*
*Page 12*

(c)      Increased costs of capital;

(d)      Legal fees, costs, and potentially substantial amounts payable in settlement or satisfaction of the factually related securities class action, captioned: *Savorelli v. The Trade Desk, Inc., et al.*, Case No.: Case 2:25-cv-01915 (C.D. Cal.), and other lawsuits; and

(e)      Recoupment of all illicit proceeds and unjust enrichment from the above-described insider trading and breaches of fiduciary duty.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon the Company as a result of the conduct described herein no later than ten (10) business days from receipt of this letter.  If you have any questions, please do not hesitate to contact the undersigned counsel.  We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*
Gregory M. Egleston

cc:    Thomas J. McKenna, Esq.
       Christopher M. Brain, Esq.

ORIGIN ID:JRAA   (212) 983-1300
THOMAS J. MCKENNA
GAINEY MCKENNA & EGLESTON
260 MADISON AVENUE
22ND FLOOR
NEW YORK, NY 10016
UNITED STATES US

SHIP DATE: 19JUN25
ACTWGT: 1.00 LB
CAD: 80142431/INET4535

TO  MR. JEFF T. GREEN
THE TRADE DESK, INC.
42 N. CHESTNUT STREET

VENTURA CA 93001

(805) 585-3434
INV:
PO:                    DEPT:
REF: 100.1869

BILL SENDER

SW OXRA

TRK# 0201  8821 6426 0382

TUE – 24 JUN 5:00P
EXPRESS SAVER

CA-US   BUR   93001

FedEx
Express

E

J252025040801uv

58GJ1/0CF5/59F2



After printing this label:

**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**

1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT B



Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California  94304-1050

O: 650.493.9300
F: 866.974.7329

CAZ HASHEMI
chashemi@wsgr.com
Direct Dial: (650) 320-4827

August 4, 2025

**By Email**
Gregory M. Egleston
Gainey McKenna & Egleston
260 Madison Avenue, 22nd Floor
New York, NY  10016
gegleston@gme-law.com

**Re:**          **Demand on the Board of Directors of The Trade Desk, Inc.**

Dear Greg,

We write on behalf of The Trade Desk, Inc. ("The Trade Desk" or the "Company") regarding the litigation demand made on behalf of Joseph F. Fernicola (the "Shareholder"), a purported shareholder of the Company, dated June 19, 2025 (the "Fernicoa Demand").

Prior to receiving the Fernicola Demand, the Company's Board of Directors (the "Board") received another related litigation demand based on substantially similar alleged facts and claims (together, the "Litigation Demands").

The Board takes litigation demands seriously.  After receiving the Litigation Demands, the Board determined to evaluate the Litigation Demands and determine appropriate next steps.  As you are aware, the factual bases underlying the Litigation Demands derive primarily from the facts alleged in the consolidated shareholder class action pending in the U.S. District Court for the Central District of California (the "Class Action").  The Class Action remains at an early stage, and developments in the Class Action may impact the Board's evaluation of the Litigation Demands.  Accordingly, the Board determined that the Litigation Demands are premature and that it would be in the best interest of the Company and its shareholders to defer action on the Litigation Demands until the underlying Class Action further progresses.

The Trade Desk reserves all other rights and defenses in response to the Fernicola Demand.

**WILSON
SONSINI**

Gregory M. Egleston
August 4, 2025
Page 2

Sincerely,

WILSON SONSINI GOODRICH
 & ROSATI, P.C.

*/s/ Caz Hashemi*

Caz Hashemi

cc:    Ben Crosson
       Brad Sorrels
       Thomas J. McKenna
       Christopher M. Brain

# EXHIBIT C

# GAINEY McKENNA & EGLESTON

ATTORNEYS AT LAW

260 MADISON AVENUE
22nd FLOOR
NEW YORK, NEW YORK 10016
TEL: (212) 983-1300
FAX: (212) 983-0383

www.gme-law.com

375 ABBOTT ROAD
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York
Address

April 21, 2026

**By Email – chashemi@wsgr.com**

Caz Hashemi, Esq.
Wilson Sonsini Goodrich & Rosati, P.C.
650 Mill Page Road
Palo Alto, CA 94304-1050

    Re:    <u>Mr. Joseph Fernicola's Demand on the Board of The Trade Desk, Inc.</u>

Dear Mr. Hashemi:

As you may recall, we represent Mr. Joseph Fernicola ("Stockholder") who made a demand on the Board of Directors ("Board") of The Trade Desk, Inc. ("Trade Desk" or the "Company"). Following Stockholder's demand, Stockholder and the Company entered into an agreement to defer the demand pending the resolution of the motion to dismiss in the factually related class action, captioned: *In re The Trade Desk, Inc. Securities Litig.*, Case No.: 2:25-cv-01396 (C.D. Cal.) (the "Securities Class Action").

On March 17, 2026, the court in the Securities Class Action denied the defendants' motion. The time for any appeal also expired last week. Accordingly, the agreement between Stockholder and the Company has been terminated and the deferral has been lifted.

Given the court's findings in the Securities Class Action, and that the Company clearly has valuable claims to pursue, Stockholder believes that it is in the Company's best interests to now investigate the allegations raised by the demand and commence an action against the individuals responsible. Please confirm within ten (10) days that the Board will commence its investigation into the alleged wrongdoing and what actions the Board plans to take. We are available to discuss the demand and/or assist the Board as necessary in its investigation.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Thomas J. McKenna*
Thomas J. McKenna

*Caz Hashemi, Esq.*
*April 21, 2026*
*Page 2*


cc.:    Gregory M. Egleston, Esq. (By email)
        Christopher M. Brain, Esq. (By email)
        Ben Crosson, Esq. (By email)
        Brad Sorrels, Esq. (By email)

# EXHIBIT D



May 8, 2026

Gregory M. Egleston
Gainey McKenna & Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016

Re:   **Stockholder Demand on Trade Desk's Board of Directors**

On behalf of the Board of Directors (the "Board") of The Trade Desk, Inc. ("Trade Desk" or the "Company"), I write regarding your June 19, 2025 demand letter (the "Demand") and April 21, 2026 follow-up letter sent on behalf of purported Trade Desk stockholder, Joseph Fernicola. The Board has again reviewed Mr. Fernicola's demand that the Board commence an action on behalf of Trade Desk against certain directors and officers for alleged breaches of fiduciary duties in connection with certain statements regarding the rollout of Kokai. Demand at 1-2. The Demand alleges that these circumstances resulted in the Company being subject to "lawsuits" (*id.* at 12), including *In re The Trade Desk, Inc. Securities Litigation*, Case No. 2:25-cv-01396-CAS-DFM (C.D. Cal) (the "Securities Litigation"). Indeed, the primary basis of purported misconduct alleged in the Demand is the same as in the Securities Litigation, including many of the same purported misrepresentations and omissions. *Id*. at 2-8.

Based on its continued review, the Board has determined that because the claims in the Demand overlap significantly with the facts being litigated in the Securities Litigation, commencing an investigation in response to the Demand continues to be premature at this juncture. Among other things:

(1) the Company's right to relief may hinge, in part, on the outcome of the Securities Litigation, which the Demand acknowledges by seeking recovery of the "*potentially* substantial amounts payable in settlement or satisfaction of" the Securities Litigation (Demand at 12) (emphasis added);

(2) the Demand explicitly seeks recovery of "[l]egal fees" and "costs" in connection with such "lawsuits," which are continuing to be incurred (*id.*);

(3) it would preserve Company resources to defer investigation of the allegations in the Demand until the Securities Litigation is completed, when the Board can obtain full advantage of the facts and circumstances surrounding the Securities Litigation, and the Company knows whether or not it ultimately will be held liable; and

(4) the Company could be prejudiced if the Board were to investigate the allegations in the Demand simultaneously with defending the Securities Litigation.

Contrary to Mr. Fernicola's assertion, denial of the defendants' motion to dismiss in the Securities Litigation does not establish that "the Company clearly has valuable claims to pursue," nor did the court make any "findings" there. Apr. 21, 2026 Letter at 1. Rather, the court merely concluded that the plaintiffs' allegations were sufficient to state a claim; discovery in the Securities Litigation has only just begun. Indeed, the court made clear several times during oral argument that it viewed the motion to dismiss as a "close call." *See* Mar. 16, 2026 Transcript at 5:4, 36:20. Unsurprisingly, plaintiffs who have brought related derivative actions have agreed to stay their complaints based on the status of the Securities Litigation. Accordingly, the Board has determined that it is in the best interests of the Company and its stockholders to continue to defer investigation of the allegations in the Demand pending resolution of the Securities Litigation.



The Board will continue to monitor the status of the Securities Litigation, and will promptly resume discussion of the Demand, and initiate a process to determine its definitive response thereto, after resolution of the Securities Litigation.  The Board will thereafter advise Mr. Fernicola of its final determination regarding the Demand, and what, if any, remedial action is appropriate.

Sincerely,

Jay R. Grant
**Chief Legal Officer**
**The Trade Desk**

cc:  Thomas J. McKenna
Christopher M. Brain
Caz Hashemi
Ben Crosson
Brad Sorrels